459 S.E.2d 114

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Susan MILLER, Defendant Below, Appellant.**

**No. 22571.**

Supreme Court of Appeals of West Virginia.

Submitted May 3, 1995.

Decided May 18, 1995.

---

4

Timothy L. Sweeney, Pros. Atty., St. Marys, for appellee.

John M. Butler, St. Marys, for appellant.

CLECKLEY, Justice:

The defendant, Susan Miller, appeals her September 29, 1993, conviction by jury of the offense of battery. By order dated October 18, 1993, the Circuit Court of Pleasants County entered the guilty verdict and ordered the defendant to pay costs.[1] The defendant was not sentenced to serve any time in jail for the offense.[2] The defendant asserts on appeal to this Court that the trial court erred by refusing to grant her motion to dismiss the battery charge on the grounds of *res judicata* and/or collateral estoppel. The defendant also claims ineffective assistance of counsel and plain error by the trial court's failure to give a self-defense instruction.

## I.

### FACTS AND PROCEDURAL BACKGROUND

The defendant was employed as a licensed practical nurse at the Colin Anderson Center, which is a state-operated facility for the mentally retarded located near St. Marys, West Virginia. On February 10, 1992, the defendant was working at the Center when a staff psychologist, Christopher Northrup, observed her slapping a male patient's head. As a result of the incident, the defendant's employment was terminated and a battery charge was brought against her. The defendant denies she slapped the patient and contends Mr. Northrup misperceived what he saw.

At the time of the incident, the male patient was twenty-four years old. According to his individual habilitation plan, he is severely mentally retarded with an I.Q. of 22 and an estimated mental age of three years and nine months. In addition, the male patient has several maladaptive behaviors including noncompliance and aggression. He typically speaks only in one- or two-word utterances.

The defendant testified at trial that she was at the doorway of a living area when she witnessed the male patient begin to pick on a female patient who was known to have an "explosive personality" and who was sleeping on a couch. The defendant stated the male patient went over to the female patient, picked up her arm, and appeared as if he was going to bite it. The defendant said she

---

1. The defendant previously was convicted of battery before the Magistrate Court of Pleasants County and took a *de novo* appeal to the trial court.

2. By final order dated March 7, 1994, the trial court extended the defendant's appeal period.

intervened and took both arms of the male patient, pulled him back across the room to another couch, where he previously was sitting, and told him not to bother the female patient. She then "shoved" on his arms and chest to get him to sit down. He did sit, but then began to get up again so the defendant said she "shoved" him back down to a sitting position. While she was shoving him down the second time, Mr. Northrup came into the room, saw what was transpiring, called the defendant's name, and went over to the male patient. The defendant then left the room to finish dispensing medication to the other patients.

Mr. Northrup testified that when he entered the room he observed the defendant standing near the end of a coffee table. The coffee table was askew and was wedged against a couch. Mr. Northrup described the angle of the coffee table and the couch as creating a funnel shape with the defendant standing near the open end of the funnel "in a way that would prevent somebody from getting through" the area. Mr. Northrup stated he saw the defendant holding back her left hand which had a lit cigarette in it. It seems from the transcript that Mr. Northrup demonstrated that the defendant's right hand was outstretched in front of her.[3] At that time, the male patient was "half sitting ... not touching but kind of cowered over" a couch.

Mr. Northrup said he heard the defendant tell the male patient " 'you're not going to bite her,' and she shouted at him, and then from about a foot and a half or so away, brought her hand against the side of his head in a slapping motion, at which point he went backward on the couch[.]" Mr. Northrup claimed he "shouted in horror" and called the defendant's name "in a very loud voice," at which time the defendant turned around and saw him. Mr. Northrup described the defendant as being "obviously very emotionally agitated at the moment." In addition, he alleged she told him something to the effect "she was very glad that she was going to have time off coming up because she really needed it[.]"[4] Mr. Northrup said he went over to the male patient and asked him if he had been hit. The male patient responded by placing his hand on his head and saying yes. Both the defendant and Mr. Northrup stated they did not discuss the incident before the defendant left the room.

The day the incident occurred, the defendant was suspended pending an investigation. The next day she met with an administrator and an assistant administrator of the facility and her employment was terminated. During the trial, the prosecuting attorney called several witnesses who testified it was not within the facilities procedures and it was inappropriate to slap a disruptive patient.

After her employment was terminated, the defendant filed a grievance with the West Virginia Education and State Employees Grievance Board (Grievance Board). After a Level IV administrative hearing, the administrative law judge (ALJ) issued a decision, dated June 11, 1993, in favor of the defendant/grievant. The decision stated, *inter alia*, that the employer "failed to prove, by a preponderance of evidence that [the] Grievant engaged in patient abuse on February 10, 1992, or at any other time." The decision also ordered the employer to reinstate the grievant to her previous employment with full back pay.[5] The employer appealed this decision, and it was affirmed by the Circuit Court of Pleasants County by order entered September 1, 1993.

## II.

### *RES JUDICATA* AND COLLATERAL ESTOPPEL

The defendant first argues that because she was exonerated administratively on the

---

3. The exact quote from the transcript is that the defendant "had a cigarette lighted in her left hand, holding it back like this, and her arm was outstretched like this, forward (indicating)." There is no detailed description in the transcript of what Mr. Northrup was demonstrating.

4. The defendant testified that at the end of her shift on the day this incident occurred she was scheduled to go on a thirty-day vacation.

5. The decision permitted the employer to make any appropriate offset of back pay, but also ordered the employer to give the grievant "experience credit" and "to remove any mention of this incident from [the grievant's] personnel files or other official records, and to refrain from ever relying upon other information regarding this incident to support action against [the grievant] or her interests."

charge of patient abuse, the prosecuting attorney was barred from pursuing the criminal battery charge against her on the grounds of *res judicata* and/or collateral estoppel. For reasons discussed below, we find the defendant's argument unpersuasive.

■ We begin by stating the doctrines of *res judicata*, or claim preclusion, and collateral estoppel, or issue preclusion, are closely related. *Res judicata* generally applies when there is a final judgment on the merits which precludes the parties or their privies from relitigating the issues that were decided or the issues that could have been decided in the earlier action. *See Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308, 313 (1980); *In re Estate of McIntosh*, 144 W.Va. 583, 109 S.E.2d 153 (1959). A claim is barred by *res judicata* when the prior action involves identical claims and the same parties or their privies. Collateral estoppel, however, does not always require that the parties be the same. Instead, collateral estoppel requires identical issues raised in successive proceedings and requires a determination of the issues by a valid judgment to which such determination was essential to the judgment.[6] *Conley v. Spillers*, 171 W.Va. 584, 301 S.E.2d 216 (1983); *Lane v. Williams*, 150 W.Va. 96, 100, 144 S.E.2d 234, 236 (1965). As counsel for the defendant suggested during oral argument on appeal, the issue here is whether collateral estoppel barred the criminal prosecution.

■ Collateral estoppel will bar a claim if four conditions are met: (1) The issue previously decided is identical to the one presented in the action in question; (2) there is a final adjudication on the merits of the prior action; (3) the party against whom the doctrine is invoked was a party or in privity with a party to a prior action; and (4) the party

against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

■ The doctrines of *res judicata* and collateral estoppel were developed in the context of judicial proceedings, but may be applied to administrative actions as well. *See* 2 *Restatement (Second) of Judgments* § 83 (1982). Thus, the findings and conclusions of an administrative agency may be binding upon the parties in a subsequent proceeding if the agency that rendered the decision acted in a judicial capacity and resolved disputed issues of fact which the parties had an opportunity to litigate. *See Vest v. Board of Educ. of the County of Nicholas*, 193 W.Va. 222, 455 S.E.2d 781.[7] *See also University of Tenn. v. Elliott*, 478 U.S. 788, 797–98, 106 S.Ct. 3220, 3225–26, 92 L.Ed.2d 635, 645–46 (1986), *quoting United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 421–22, 86 S.Ct. 1545, 1559–60, 16 L.Ed.2d 642, 660–61 (1966), and *citing Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 484–85 n. 26, 102 S.Ct. 1883, 1899 n. 26, 72 L.Ed.2d 262, 282 n. 26 (1982).

" 'Collateral estoppel' is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice." *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469, 475 (1970), *limited on other grounds Dowling v. United States*, 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). It is "that aspect of the doctrine of [collateral estoppel] which serves to estop the relitigation by parties and their privies of any right, fact or legal matter which is put in issue and has been once determined by a valid and final judgment of a court of competent jurisdiction." *State v. Wilson*, 180 Conn. 481, 485, 429 A.2d 931, 933 (1980). (Citations omitted). *See also* 1 *Restatement (Second) of Judgments* § 27

---

6. Collateral estoppel is broader than the doctrine of *res judicata* because it applies to a cause of action different from that litigated in the original controversy. On the other hand, collateral estoppel is narrower because it does not apply to matters that could have been litigated but were not.

7. In *Vest*, 193 W.Va. at 223, 455 S.E.2d at 782, we stated "that for preclusion to attach to quasi-

judicial determinations of administrative agencies, at least where there is no statutory authority directing otherwise, the prior 'decision must be rendered pursuant to the agency's adjudicatory authority and the procedures employed by the agency must be substantially similar to those used in a court[.]' *Liller v. West Virginia Human Rights Comm'n*, 180 W.Va. 433, 440, 376 S.E.2d 639, 646 (1988)." (Footnote omitted).

**10**

(1982).[8] In principle, the doctrine of collateral estoppel applies to criminal cases as well as civil proceedings. *See United States v. Ragins*, 840 F.2d 1184, 1194 (4th Cir.1988); *State v. Porter*, 182 W.Va. 776, 392 S.E.2d 216 (1990).[9]

This case is the first opportunity, however, that we have had to consider whether collateral estoppel operates to bar relitigation in a state criminal proceeding of issues previously decided by a state administrative agency.[10] The State's argument is essentially twofold: (1) The issue raised and the procedure used at the administrative hearing were not substantially the same as those raised and used in the criminal prosecution of the defendant; and (2) the doctrine of collateral estoppel is not applicable to the criminal proceeding against the defendant because there is no privity between the Office of Prosecuting Attorney of Pleasants County and the Department of Health and Human Resources, which was represented by the West Virginia Attorney General's Office with regard to the grievance.

■ We begin our analysis with a brief discussion of one important exception to collateral estoppel. Section 28 of 1 *Restatement (Second) of Judgments* (1980) sets forth the exceptions to the general rule of collateral estoppel or issue preclusion. Section 28(3) provides that relitigation of an issue is not precluded when "[a] new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in two courts[.]" 1 *Restatement (Second) of Judgments* at 273. Comment d to Section 28 states that where "the proce-

dures available in the first court may have been tailored to the prompt, inexpensive determination of small claims," a compelling reason exists not to apply collateral estoppel. 1 *Restatement (Second) of Judgments* at 279. The simple procedure of the first forum "may be wholly inappropriate to the determination of the same issues when presented in the context of a much larger claim." 1 *Restatement (Second) of Judgments* at 279. *See Salida School District R–32–J v. Morrison*, 732 P.2d 1160, 1165 (Colo.1987).

■ In our view, for purposes of issue preclusion, issues and procedures are not identical or similar if the second action involves application of a different legal standard or substantially different procedural rules, even though the factual settings of both suits may be the same. *See Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331 n. 15, 99 S.Ct. 645, 651 n. 15, 58 L.Ed.2d 552, 562 n. 15 (1979) ("[i]ndeed, differences in available procedures may sometimes justify not allowing a prior judgment to have estoppel effect in a subsequent action even between the same parties"), *limited on other grounds United States v. Mendoza*, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984). Therefore, not only the facts but also the legal standards and procedures used to assess them must be similar. 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4417 at 165 (1981), *quoting Peterson v. Clark Leasing Corp.*, 451 F.2d 1291, 1292 (9th Cir. 1971).

In *Vest, supra*, we were faced with an analogous situation to the case *sub judice*.

---

8. Our prior cases have recognized that the principles undergirding *res judicata* serve "to advance several related policy goals—(1) to promote fairness by preventing vexatious litigation; (2) to conserve judicial resources; (3) to prevent inconsistent decisions; and (4) to promote finality by bringing litigation to an end." *Mellon–Stuart Co. v. Hall*, 178 W.Va. 291, 298, 359 S.E.2d 124, 131 (1987), *citing Pitsenbarger v. Gainer*, 175 W.Va. 31, 330 S.E.2d 840 (1985); *Conley, supra*.

9. The United States Supreme Court in *Ashe v. Swenson, supra*, indicated the principle of collateral estoppel is embodied in the Double Jeopardy Clause of the Fifth Amendment which applies to the states through the Fourteenth Amendment.

10. The defendant argues this issue was decided in *Mellon–Stuart Co., supra*. Specifically, the defendant states "[t]he question of whether an administrative ruling may be given collateral estoppel effect and thus bar subsequent criminal prosecution, was considered by this Court in *Mellon* [.]" Actually, in *Mellon–Stuart Co.*, we merely held that in a subsequent mandamus action between the Mellon–Stuart Company and the West Virginia Board of Regents, a prior adjudication in the court of claims could receive preclusive effect. Neither action involved criminal proceedings.

*Vest* involved two questions certified to this Court by the United States District Court for the Southern District of West Virginia. The first question asked whether the Grievance Board had subject-matter jurisdiction over a gender-based discrimination claim. We held the Grievance Board had such jurisdiction as defined by its own authorizing legislation. However, we also held the Grievance Board did not have authority to determine if an individual could make a claim under West Virginia's Human Rights Act.

At the outset, we recognize the authorizing legislation of the Grievance Board in the present case is different than it was in *Vest*. *Vest* involved a substitute teacher who fell within a certain class of educational employees whose grievances are controlled by W.Va. Code, 18–29–1, *et seq*. On the other hand, the grievance in the present case was governed by the more general state employees' grievance procedure as set forth in W.Va. Code, 29–6A–1, *et seq*.[11] Nevertheless, the rationale underlying our decision in *Vest* also is applicable to the present case.

For instance, in *Vest*, we relied upon the language of W.Va.Code, 18–29–1 (1992), to point out that the grievance procedure was developed "to provide the State's educational employees with 'a simple, expeditious and fair process for resolving [employment] problems[.]'" 193 W.Va. at 224, 455 S.E.2d at 783. In addition, we also found "the Grievance Board's authority extends only to resolving grievances made cognizable by its authorizing legislation, that is, those grievances recognized in W.Va.Code, 18–29–2 [ (1992) ]." 193 W.Va. at 225, 455 S.E.2d at 784. We further stated it is clear there is no statutory authority "for the Grievance Board to decide whether a person states a claim under the Human Rights Act." 193 W.Va. at 225, 455 S.E.2d at 784.

Applying this same analysis to the present case, we find the purpose of the grievance procedure under W.Va.Code, 29–6A–1, *et seq.*, is "to provide a procedure for the *equitable and consistent resolution of employment grievances* [.]" W.Va.Code, 29–6A–1 (1988). (Emphasis added). Just as we determined the Grievance Board has no authority to determine whether an individual has a claim under the Human Rights Act, it is clear the Grievance Board has no authority to resolve a criminal matter. Simply stated, the purpose of the Grievance Board is to fairly and efficiently resolve employment problems. As in *Vest*, however, this conclusion is not to say the Grievance Board's factual findings and conclusions of law may not overlap another area of the law, *i.e.*, a discrimination claim or a criminal matter. We found in *Vest* that in W.Va.Code, 18–29–2(a), the legislature gave the Grievance Board the authority to hear a "discrimination" claim.[12] Therefore, we concluded the Grievance Board did have subject-matter jurisdiction over the claim.

■ Given our finding that the Grievance Board had jurisdiction to entertain a gender-based discrimination claim, the second certified question asked us to determine whether an action brought under the Human Rights Act would be barred if it previously was presented to the Grievance Board by the same parties and involved the same facts and circumstances. To resolve this question, we stated in Syllabus Point 2 of *Vest*:

"For issue or claim preclusion to attach to quasi-judicial determinations of administrative agencies, at least where there is no statutory authority directing otherwise, the prior decision must be rendered pursuant to the agency's adjudicatory authority and

11. W.Va.Code, 29–6A–1 (1988), states that Article 6A does not apply to all state employees and specifically provides:

"The purpose of this article is to provide a procedure for the equitable and consistent resolution of employment grievances raised by nonelected state employees who are classified under the state civil service system, or employed in any department, other governmental agencies, or by independent boards or commissions created by the Legislature, with the ex-

ception of employees of the board of regents, state institutions of higher education, the Legislature, any employees of any constitutional officer unless they are covered under the civil service system, and members of the department of public safety."

12. In *Vest*, we recognized the term "discrimination" is defined differently under W.Va.Code, 18–29–2(m), than it is in the Human Rights Act, W.Va.Code, 5–11–9 (1992).

the procedures employed by the agency must be substantially similar to those used in a court. In addition, the identicality of the issues litigated is a key component to the application of administrative *res judicata* or collateral estoppel."

Under this analysis, we found a decision by the Grievance Board had no preclusive effects over human rights claims.

The criteria we adopted in Syllabus Point 2 of *Vest* is equally applicable to the present case. The procedure employed at a grievance proceeding is obviously much different than that employed at a criminal trial. For instance, a criminal trial is governed by the Rules of Criminal Procedure, while a grievance proceeding is not. In addition, parties in a criminal proceeding are afforded a wide variety of rules and statutory protections. For example, reciprocal discovery is provided under Rule 16 of the West Virginia Rules of Criminal Procedure. Likewise, the West Virginia Rules of Evidence are strictly applied in criminal proceedings. Moreover, under the Sixth Amendment to the United States Constitution, a criminal defendant may invoke his rights to a speedy and public trial before an impartial jury; "to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have Assistance of Counsel for his defence." *See also* W.Va. Const. art. 3, § 14.

■ Although the purpose of the grievance procedure is to provide for an "equitable" resolution of an employment problem,[13]

the grievance procedure simply does not provide a grievant with the same level of protection afforded a criminal defendant. Nor do we find merit to the defendant's argument that because she was not found guilty of patient abuse under the lower preponderance of the evidence standard, she could not be convicted of battery beyond a reasonable doubt.[14] As previously mentioned, the Grievance Board has no authority to resolve a criminal matter, and the procedures employed and protections afforded at each proceeding are significantly different. In fact, the salutary purposes of an informal grievance procedure would be frustrated if collateral estoppel were applied so as to subsequently limit a full and fair consideration of the issue in a criminal case.

Moreover, we recognize the issue of whether an individual was terminated wrongfully for patient abuse is not the same issue as whether an individual committed a criminal act of battery. An individual who has filed a grievance for wrongful termination may argue a number of factors that would not be raised in a criminal context. For instance, at a grievance proceeding, an individual could argue that his or her termination was in violation of one of the statutory provisions with regard to the termination procedure. An individual also could assert that his or her termination was based on a discriminatory motive or that he or she was given a much harsher sanction than other employees accused of the same or similar offenses. Indeed, in the present case, the ALJ specifically determined in dicta that the grievant demonstrated she was "similarly situated to other

---

13. *See* note 11, *supra*.

14. The defendant has invited our attention to the recent successful double jeopardy challenges to parallel criminal and forfeiture prosecutions across this country. There is, indeed, a rapidly developing line of authority based on the combined force of decisions in *Austin v. United States*, —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993); *Department of Revenue of Montana v. Kurth Ranch*, —— U.S. ——, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994); and *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989). We find, however, these cases to be inapposite.

The force of the Supreme Court's *Kurth Ranch/Austin/Halper* triumvirate of authority not only defines civil forfeiture as "punishment" for

double jeopardy purposes, but also announces that civil forfeiture effectively will trigger the Double Jeopardy Clause's prohibition of successive punishments even if Congress intended to permit imposition of multiple punishments— such as a criminal penalty and a forfeiture—in a single proceeding. On the other hand, termination from public employment has not been recognized as a criminal sanction. *See generally Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.E.2d 1 (1977). Unless the tribunal has the authority to convict or acquit, the principles of double jeopardy are inapplicable. *United States v. MacDonald*, 585 F.2d 1211 (4th Cir. 1978), *cert. denied*, 440 U.S. 961, 99 S.Ct. 1504, 59 L.Ed.2d 774 (1979).

accused workers who were given far lighter punishments" than she was given. Therefore, the ALJ concluded the grievant established *prima facie* evidence of discrimination and the employer "failed to adequately articulate a legitimate, nondiscriminatory reason for the distinctions[.]" No such disparate-penalty defense is available to determine whether an individual actually committed a criminal act of battery.[15]

Similarly, we agree with the State that there is no privity between the prosecuting attorney's office and the Department of Health and Human Resources, which was represented by the Attorney General's Office in the grievance proceedings. "Privity is not established ... from the mere fact that persons may happen to be interested in the same question or in proving the same facts." 46 Am.Jur.2d *Judgments* § 532 (1969). While the concept of privity is difficult to define precisely, it has been held that "a key consideration for its existence is the sharing of the same legal right by the parties allegedly in privity." *BTC Leasing, Inc. v. Martin,* 685 S.W.2d 191, 198 (Ky.App.1984). This consideration is to ensure that the interests of the party against whom collateral estoppel is being asserted have been adequately represented because of his purported privity with a party at the initial proceedings. *See BTC Leasing Inc., supra;* 46 Am.Jur.2d *Judgments* § 532.[16]

The defendant relies heavily on the fact that in both proceedings the State of West Virginia was involved as a party to the litigation. In the administrative hearing, the charging party was the Department of Health and Human Resources, a state agency, which was represented by the Attorney General's Office. Of course, in the criminal prosecution, the State of West Virginia was represented by the prosecuting attorney. We believe *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940), is instructive. Although the Supreme Court indicated that privity might exist between officers of the same government, it pointed out that "[t]he crucial point is whether or not in the earlier litigation the representative of the United States had authority to represent its interests in a final adjudication of the issue in controversy." 310 U.S. at 403, 60 S.Ct. at 917, 84 L.Ed. at 1276. (Citation omitted).

The analysis of *Sunshine Anthracite Coal Co.* compels the conclusion that the Department of Health and Human Resources is not in privity with the prosecuting attorney's office.[17] The Department of Health and Human Resources is granted statutory authority to investigate complaints against personnel under its jurisdiction, which was obviously its function in this instance, and, if such complaints have validity, to take action against personnel, which may consist of dismissal, suspension, the imposition of a probationary period, or reprimand. The prosecuting attorney, however, exercises powers and duties with respect to the investigation and prosecution of criminal matters.

The purpose of an administrative proceeding, therefore, is to determine whether a grievant, as a public employee, engaged in an activity which warrants an adverse employment action, while the prosecuting attorney's interest is in having guilt or innocence of a

---

15. By distinguishing these issues, we do not mean to suggest that battery may not be considered a form of patient abuse. We merely are stating there are differences between a grievance and a criminal proceeding that merit an independent review of the facts and issues. Thus, although the ALJ did not find patient abuse at the grievance proceeding, it did not foreclose the criminal proceeding on the issue of battery.

16. Privity requires the interests of a party against whom claim or issue preclusion is asserted were represented adequately by the party's purported privity at the initial hearing or trial. The absolute identicality of legal issues is fundamental to a finding of privity, and the mere fact that the two parties are interested in proving or disproving the same facts alone will not create privity.

17. Of course, the general common law rule is that claim or issue preclusion only works against those who had a fair chance to contest the earlier litigation. This rule in recent decades has been liberalized, and the focus of the preclusion inquiry has in some instances shifted from whether a party itself participated in the prior litigation to whether the party's interests were fully represented in the earlier case, albeit by another. Here, the circuit court did not find the interests of the prosecuting attorney adequately were protected in the administrative hearing. We agree.

defendant determined under the applicable criminal law and in seeing that proper punishment is meted out in the event that the criminal law has been violated.[18] The prosecuting attorney represents the broader public interests in the effective administration of justice. *See California v. Demery,* 104 Cal. App.3d 548, 163 Cal.Rptr. 814 (1980); *Keating v. Department of Natural Res.,* 140 Ga. App. 796, 232 S.E.2d 84 (1976); *aff'd,* 238 Ga. 605, 234 S.E.2d 519 (1977); *Younge v. State Board of Registration for the Healing Arts,* 451 S.W.2d 346 (Mo.1969), *cert. denied,* 397 U.S. 922, 90 S.Ct. 910, 25 L.Ed.2d 102 (1970); *People v. Morgan,* 111 App.Div.2d 771, 490 N.Y.S.2d 30 (1985). *See generally* Annot., 30 A.L.R.4th at 856 (1984).

 Thus, we conclude that the State's interest in having guilt or innocence determined is not adequately served in an administrative proceeding because the prosecuting attorney has no control over the timing, substance, or litigation of charges against the defendant at the grievance level. The State is not collaterally estopped from prosecuting the defendant for criminal battery because no privity exists.

For all the aforementioned reasons, we find the circuit court did not commit error in denying the defendant's motion to dismiss based upon her argument of *res judicata* and/or collateral estoppel.

### III.

### INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

Once again we are presented on direct appeal with a claim of ineffective assistance of counsel. We have been asked on numerous occasions to review these claims on direct appeal. Therefore, we believe it is helpful to discuss why summary disposition of ineffective assistance claims on direct appeal is inappropriate.

As a threshold matter, it should be observed that "[t]he mission of the appellate judiciary is neither to mull theoretical abstractions nor to practice clairvoyance." *Moore v. Murphy,* 47 F.3d 8, 10 (1st Cir. 1995). To meet our review function, we must match applicable principles of law to the discerned facts and circumstances of the litigated case. When those facts are not properly furnished to this Court, we are denied the basic tools necessary to carry out our function. Thus, under those circumstances, we have found that issues, such as ineffective assistance of counsel, were not ripe for direct appellate review. *See State v. Triplett,* 187 W.Va. 760, 771, 421 S.E.2d 511, 522 (1992) ("it is the extremely rare case when this Court will find ineffective assistance of counsel when such a charge is raised as an assignment of error on a direct appeal").

Indeed, even in the broader context of appellate review, should an appellant spurn his or her duty and drape an inadequate or incomplete record around this Court's neck, this Court, in its discretion, either has scrutinized the merits of the case insofar as the record permits or has dismissed the appeal if the absence of a complete record thwarts intelligent review. *See Barefoot v. Sundale Nursing Home,* 193 W.Va. 475, 457 S.E.2d 152 (1995); *State v. Honaker,* 193 W.Va. 51, 56 n. 4, 454 S.E.2d 96, 101 n. 4 (1994). Typically, this flexible approach is inappropriate on direct appeals claiming ineffective assistance of trial counsel. In cases involving ineffective assistance on direct appeals, intelligent review is rendered impossible be-

---

**18.** The duties and responsibilities of a prosecuting attorney generally are set forth in W.Va. Code, 7-4-1 (1971). As relates to a prosecuting attorney's responsibility in criminal matters, W.Va.Code, 7-4-1, states, in part:

"It shall be the duty of the prosecuting attorney to attend to the criminal business of the State in the county in which he is elected and qualified, and when he has information of the violation of any penal law committed within such county, he shall institute and prosecute all necessary and proper proceedings against the offender, and may in such case issue or

cause to be issued a summons for any witness he may deem material. Every public officer shall give him information of the violation of any penal law committed within his county. It shall also be the duty of the prosecuting attorney to attend to civil suits in such county in which the State, or any department, commission or board thereof, is interested, and to advise, attend to, bring, prosecute or defend, as the case may be, all matters, actions, suits and proceedings in which such county or any county board of education is interested."

cause the most significant witness, the trial attorney, has not been given the opportunity to explain the motive and reason behind his or her trial behavior.[19]

In this vein, we have held with a regularity bordering on monotonous that if the record provided to us on direct appeal proves to be so deficient as to preclude us from reaching a reasoned determination on the merits of the ineffective assistance claim, it is the defendant who must bear the brunt of an insufficient record on appeal. *See State v. Kilmer,* 190 W.Va. 617, 631, 439 S.E.2d 881, 895 (1993); *State v. Whitt,* 184 W.Va. 340, 346, 400 S.E.2d 584, 590 (1990); *State v. Wickline,* 184 W.Va. 12, 17–20, 399 S.E.2d 42, 47–50 (1990); *State v. Tesack,* 181 W.Va. 422, 428, 383 S.E.2d 54, 60 (1989); *State v. Chamberlain,* 178 W.Va. 420, 427, 359 S.E.2d 858, 865 (1987). *See also State v. England,* 178 W.Va. 648, 363 S.E.2d 725 (1987). The very nature of an ineffective assistance of counsel claim demonstrates the inappropriateness of review on direct appeal. To the extent that a defendant relies on strategic and judgment calls of his or her trial counsel to prove an ineffective assistance claim, the defendant is at a decided disadvantage. Lacking an adequate record, an appellate court simply is unable to determine the egregiousness of many of the claimed deficiencies. Such a situation exists here.

The standard for assessing the efficiency of counsel was announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Strickland* requires the defendant to prove two things: (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." 466 U.S. at 694, 104 S.Ct. at

2068, 80 L.Ed.2d at 698. When assessing whether counsel's performance was deficient, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. To demonstrate prejudice, a defendant must prove there is a "reasonable probability" that, absent the errors, the jury would have reached a different result. 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

Our recent cases have made it clear that we have accepted *Strickland* as part of our constitutional jurisprudence. In *Wickline v. House,* 188 W.Va. at 348, 424 S.E.2d at 583, we stated "[o]ur cases thus hold that a defendant who asserts a claim of ineffective assistance of counsel must prove (1) that his legal representation was inadequate, and (2) that such inadequacy prejudiced his case. Much the same standards are found in *Strickland* [.]" We now make it explicit, in the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland.* Thus, it is necessary for us to review the defendant's claims under the *Strickland* standard.

The defendant has asserted, in the absence of a developed record, that her trial counsel failed to offer instructions on her affirmative defense of self-defense and did not make timely and appropriately specific objections to the trial court's general charge or to those instructions submitted by the prosecution. At the outset, we find these important points appear to be more than mere technicalities. Indeed, we agree with the defendant that it would be unusual for counsel to develop and rely upon self-defense at trial and then offer no instructions on the defense.[20] Such a maneuver is indicative of the lack of a trial strategy and "[n]o competent defense attor-

---

19. In fact, the defendant did not provide this Court with a transcript of the closing arguments so we could determine what theory of the case the defendant's trial counsel pursued.

20. The purpose of instructions is to clearly instruct the jury regarding the law to be applied in the case. *See United States v. Ribaste,* 905 F.2d 1140, 1143 (8th Cir.1990) ("[t]he purpose of instructing the jury is to focus its attention on the essential issues in the case and inform it of the

permissible ways in which these issues may be resolved." (Citation omitted)); *United States v. Assi,* 748 F.2d 62, 65 (2d Cir.1984) ("[t]he purpose of jury instructions is to inform the jury clearly and succinctly of the role it is to play and the decisions it must make"). Without instructions as to the law, the jury becomes mired in a factual morass, unable to draw the appropriate legal conclusions based on the facts.

ney would go to trial without first formulating an overall strategy." Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care,* 1993 U.Ill.L.Rev. 323, 356. Effective trial counsel typically prepares for a criminal defense by asking questions such as: (1) What is the objective of the defense? (2) What is the trial strategy to reach that objective? (3) How does one implement that strategy? The record before us, however, does not conclusively show the lack of a trial strategy.

The lesson to be drawn from our decisions is not that counsel's performance always or even usually is deficient if counsel fails to present available affirmative defense instructions. Nor is the lesson that the presentation of an affirmative defense instruction always will insulate counsel's performance from being condemned as ineffective. Instead, our decisions teach that a determination of whether counsel's performance is constitutionally deficient depends upon the totality of the circumstances when viewed through a lens shaped by the rules and presumptions set down in *Strickland* and its progeny.

Under these rules and presumptions, the cases in which a defendant may prevail on the ground of ineffective assistance of counsel are few and far between one another. This result is no accident, but instead flows from deliberate policy decisions this Court and the United States Supreme Court have made mandating that "[j]udicial scrutiny of counsel's performance must be highly deferential" and prohibiting "[i]ntensive scrutiny of counsel and rigid requirements for acceptable assistance[.]" *Strickland,* 466 U.S. at 689–90, 104 S.Ct. at 2065–66, 80 L.Ed.2d at 694–95. In other words, we always should presume strongly that counsel's performance was reasonable and adequate. A defendant seeking to rebut this strong presumption of effectiveness bears a difficult burden because constitutionally acceptable performance is not defined narrowly and encompasses a "wide range." The test of ineffectiveness has little or nothing to do

with what the *best* lawyers would have done. Nor is the test even what most good lawyers would have done. We only ask whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at the time, in fact, worked adequately.

We find under the limited facts presented to us regarding the performance of counsel, a reasonable lawyer certainly could have made a tactical choice not to pursue the affirmative defense of self-defense. Trial counsel may have believed the defendant would be acquitted outright given the circumstances which gave rise to the incident, an aggressive patient that was attempting to bite another patient, and given the defendant's testimony that Mr. Northrup misperceived what he saw and she never slapped the patient.[21] There is much wisdom for trial lawyers in the adage about leaving well enough alone.

[21] Having presented substantial evidence, counsel was not required to develop every conceivable defense that was available. Nor was counsel required to offer a defense or instruction on every conceivable defense. What defense to carry to the jury, what witnesses to call, and what method of presentation to use is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess. Obviously, lawyers always can disagree as to what defense is worthy of pursuing "such is the stuff out of which trials are made." *Solomon v. Kemp,* 735 F.2d 395, 404 (11th Cir.1984), *cert. denied,* 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 952 (1985).

In spite of the possible tactical reason stated above, we are asked in the present case to second guess what still may appear to be a questionable strategic choice by trial counsel without having the opportunity to hear from him. We believe the most the defendant has proved from this record is the wholly unremarkable fact that appellate

---

21. More specifically, defense counsel could have had a reasonable theory that there was no need for a self-defense instruction because the evidence was sufficient to show the defendant did not slap the patient and, thus, no battery occurred.

counsel, with the absence of an explanation from trial counsel and with luxury of time and the opportunity to focus resources on specific facts of a made record, inevitably will identify shortcomings in the performance of prior counsel. Indeed, in retrospect, one always may identify shortcomings, but perfection is not the standard for ineffective assistance of counsel.

The widespread use of the tactic of attacking trial counsel by showing what "might have been" proves that nothing is clearer than hindsight—except perhaps the rule that we will not judge trial counsel's performance through hindsight. *See, e.g., Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694 ("[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"). As is often said, nothing is so easy as to be wise after the event. In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. We hold that the mere fact that trial counsel failed to offer a viable defense instruction is not alone a sufficient ground to prove ineffectiveness of counsel.

It is apparent that we intelligently cannot determine the merits of this ineffective assistance claim without an adequate record giving trial counsel the courtesy of being able to explain his trial actions. Our decision does not foreclose further development of the ineffectiveness of counsel issue on a post-conviction collateral attack, if that procedure is available to the defendant. Nor do we hold that upon a properly developed record the claim of ineffective counsel would be without

merit. The defendant must bear the resultant onus because she has the responsibility of proving ineffective assistance of counsel and of providing us with a sufficient record.[22]

## IV.

## PLAIN ERROR

Finally, in addition to the ineffective assistance claim, the defendant makes reference to "plain error" as a means to obtain appellate review of the sufficiency of the trial court's general charge to the jury. During a conference to consider the instructions, the trial court asked defense counsel whether he wanted to offer any instructions. Defense counsel did not submit a self-defense instruction nor did he object to the trial court's failure to give such an instruction. To the contrary, counsel for the defendant explicitly stated to the trial judge that he was satisfied with the instructions as proposed by the court and that he had no objection to any portion of the jury charge. Thus, because counsel did not ask for an instruction when given the opportunity to do so and did not object to the lack of an instruction, any error by the trial court is foreclosed from appellate review unless it rises to the level of plain error.[23]

"One of the most familiar procedural rubrics in the administration of justice is the rule that the failure of a litigant to assert a right in the trial court likely will result" in the imposition of a procedural bar to an appeal of that issue. *United States v. Calverley*, 37 F.3d 160, 162 (5th Cir.1994) (*en banc* ), *cert. denied*, — U.S. —, 115 S.Ct. 1266, 131 L.Ed.2d 145 (1995). As the United States Supreme Court stated in *United States v. Atkinson*, 297 U.S. 157, 159, 56 S.Ct. 391, 392, 80 L.Ed. 555, 557 (1936), "[t]his practice is founded upon considerations of fairness to the court and to the

---

**22.** *Cf.* Hosea 8:7 (New International Version 1985) (explaining that those who "sow the wind . . . reap the whirlwind").

**23.** Concededly, the cases from this Court have sent out conflicting signals as to the existence of doctrines, other than plain error, that might permit a litigant to seek appellate review of alleged errors not objected to in the lower court. *See State v. Dellinger*, 178 W.Va. 265, 358 S.E.2d 826

(1987); *State v. Dozier*, 163 W.Va. 192, 255 S.E.2d 552 (1979). These cases seem to suggest that in addition to plain error, there is an unwaivable constitutional right to a proper jury charge in criminal cases. Today, we declare that in West Virginia criminal cases the sole bases for attacking an unobjected to jury charge are plain error and/or ineffective assistance of counsel.

parties and of the public interest in bringing litigation to an end after fair opportunity has been afforded to present all issues of law and fact." The "plain error" doctrine grants appellate courts, in the interest of justice, the authority to notice error to which no objection has been made.

■ As a general proposition, this Court has discretionary authority to consider the legality and sufficiency of the trial court's charge under the plain error doctrine. *See* W.Va.R.Crim.P. 30 & 52.[24] Our rules are nearly identical to the Federal Rules of Criminal Procedure. Historically, the "plain error" doctrine "authorizes [an appellate court] to correct only 'particularly egregious errors' ... that 'seriously affect the fairness, integrity or public reputation of judicial proceedings[.]'" *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1, 12 (1985). (Citations omitted). Plain error warrants reversal "solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816, 827 n. 14 (1982). In the seminal case of *United States v. Olano*, 507 U.S. 725, ——, 113 S.Ct. 1770, 1776–79, 123 L.Ed.2d 508, 518–21 (1993), the Supreme Court defined plain error as: (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings. Both *Olano* and *Young* are consistent with cases from this Court. *See* Syl. pt. 6, in part, *State v. Mayo*, 191 W.Va. 79, 443 S.E.2d 236 (1994), *quoting* Syl. pt. 4, *State v. England*, 180 W.Va. 342, 376 S.E.2d 548 (1988) (the plain error "'doctrine is to be used sparingly and only in those circumstances where substantial rights are affected, or the truth-finding process is substantially impaired, or a miscarriage of justice would otherwise result'"); Syl. pt. 5, *State v. Wilson*, 190 W.Va. 583, 439 S.E.2d 448 (1993) (same).

■ In *Olano*, the Supreme Court set forth, in comprehensive fashion, the appropriate analytical model for dealing with errors that were not brought to the attention of the trial court at the time and in the manner required by the applicable rules of procedure. The Supreme Court began its analysis by recognizing that Rule 52(b) of the Federal Rules of Criminal Procedure contemplates a single category of error that may be noticed—plain error that affects the substantial rights of a defendant. The Supreme Court continued by stating the first inquiry under the rule is whether there has in fact been error at all. The Supreme Court said deviation from a rule of law is error unless there is a waiver. Waiver, the Supreme Court emphasized, is the "'intentional relinquishment or abandonment of a known right.'" 507 U.S. at ——, 113 S.Ct. at 1777, 123 L.Ed.2d at 519, *quoting Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938). As noted in *United States v. Lakich*, 23 F.3d 1203, 1207 (7th Cir.1994), when there has been such a knowing waiver, there is no error and the inquiry as to the effect of the deviation from a rule of law need not be determined.

■ By contrast, mere forfeiture of a right—the failure to make timely assertion of the right—does not extinguish the error. In such a circumstance, it is necessary to continue the inquiry and to determine whether the error is "plain." "Plain," noted the Supreme Court in *Olano*, is synonymous with "'clear'" or "'obvious.'" 507 U.S. at ——, 113 S.Ct. at 1777, 123 L.Ed.2d at 519. Assuming that an error is "plain," the inquiry must proceed to its last step and a determination made as to whether it affects the substantial rights of the defendant. Normally, to affect substantial rights means that the error was prejudicial. It must have affected the outcome of the proceedings in the circuit court. In addition, "[i]t is the defendant rather than the [prosecutor] who bears the burden of persuasion with respect to prejudice." 507 U.S. at ——, 113 S.Ct. at 1778, 123 L.Ed.2d at 520.[25]

---

24. The plain error rule contained in Rule 30 is identical to the plain error rule in Rule 52. *State v. England*, 180 W.Va. 342, 348, 376 S.E.2d 548, 554 (1988).

25. Plain error should be corrected where "a miscarriage of justice would otherwise result." This phrase "means that the defendant is actually innocent ... but we have never held that a Rule 52(b) remedy is only warranted in cases of actual

We need not go further at this juncture. We have carefully reviewed the trial record and find the trial court's failure to give the self-defense instructions did not rise to the level of plain error. In fact, we find there are two separate reasons for rejecting the defendant's plain error argument. First, the record is inadequate for us to determine whether there was any error at all in this case. As previously discussed, it is not clear to us that self-defense was relied upon by the defense. The defendant failed to provide us with testimony or an affidavit by her trial counsel or the transcript of counsel's closing argument which would give us insight into his choice of trial strategy. While there was some evidence which, if believed by the jury, would have justified a self-defense instruction, the record does not demonstrate clearly to us that self-defense was in fact intended by the introduction of this evidence. In *State v. Spence*, 182 W.Va. 472, 481, 388 S.E.2d 498, 507 (1989), we succinctly stated that "the plain error rule presupposes that the record is sufficiently developed to discern the error." (Footnote omitted). We adhere to this principle in the present case.[26] *See also Frady*, 456 U.S. at 163, 102 S.Ct. at 1592, 71 L.Ed.2d at 827 ("[b]y its terms, recourse may be had to [Rule 52(b)] *only* on appeal from a trial infected with error so 'plain' the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it"). (Dictum; emphasis added).[27]

The second and more significant reason we reject the defendant's claim is because we find the defendant voluntarily waived any right she had to have the jury instructed on self-defense. Our survey of cases in this esoteric procedural corner of the law convinces us that the defendant waived any issues she might have had regarding an improper or insufficient jury charge. In *Lakich, supra*, counsel was given ample time to review and think about how the jury should be instructed in response to its question about entrapment. The court, after eliciting comments from counsel, read its proposed instruction to them. Both counsel explicitly agreed to the court's instruction. The court of appeals held under these circumstances defendant waived any objections to the instruction. 23 F.3d at 1207–08. Similarly, in *United States v. Rojo–Alvarez*, 944 F.2d 959, 971 (1st Cir.1991), the court held there was a waiver when, after the court reworded an instruction in response to the defendant's objection, defense counsel stated he was satisfied with the reworded instruction. We believe the same conclusion must be reached in the case *sub judice*. The defendant has the burden on these issues, and, in our judgment, she failed to meet this burden.

## V.

## CONCLUSION

In sum, we find the criminal prosecution of the defendant was not barred on the grounds of *res judicata* and/or collateral estoppel as the result of the prior decision by the West Virginia Education and State Employees Grievance Board. In addition, we find the

---

innocence." *Olano*, 507 U.S. at ——, 113 S.Ct. at 1779, 123 L.Ed.2d at 521. (Citations omitted). The standard that guides the correction of plain error is whether the error " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *Olano*, 507 U.S. at ——, 113 S.Ct. at 1779, 123 L.Ed.2d at 521; *quoting United States v. Atkinson*, 297 U.S. at 160, 56 S.Ct. at 392, 80 L.Ed. at 557. Indeed, Rule 52(b) prejudice is indistinguishable from ordinary, harmless error review, except for the fact that the burden is upon the defendant. It is clear there may be cases where the error affects substantial rights but the error neither causes a miscarriage of justice nor seriously affects the fairness, integrity, or public reputation of the judicial proceeding.

**26.** Although most of our cases recognize that an error must be clearly evident to be plain, a significant number omit or give insufficient weight to this element of the plain error equation. We today disavow all holdings and articulations inconsistent with the text of this opinion.

**27.** Nor does this case raise the issue that *Olano* explicitly reserved: "We need not consider the special case where the error was unclear at the time of trial but becomes clear on appeal because the applicable law has been clarified." 507 U.S. at ——, 113 S.Ct. at 1777, 123 L.Ed.2d at 519. There has been no change in the law since the time of trial on the issue raised herein. As suggested in *United States v. Calverley*, 37 F.3d at 162–63, error must be clear or obvious at the time of trial.

defendant did not meet her burden of proof to establish ineffective assistance, nor did she establish the trial court committed plain error by failing to give the jury a self-defense instruction. For the foregoing reasons, we affirm the final order of the Circuit Court of Pleasants County.

Affirmed.

BROTHERTON, J., did not participate.

MILLER, Retired Justice, and FOX, Judge, sitting by temporary assignment.