# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs)  No. 13-0421** (Cabell County 12-F-128, 12-F-444)

**William Fykes,**
**Defendant Below, Petitioner**

**FILED**

**June 10, 2016**

**released at 3:00 p.m.**
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

The petitioner, William Fykes, by counsel Dana F. Eddy and Crystal L. Walden, appeals the circuit court's amended order of April 13, 2013, entered in conformance with the jury's verdict, convicting Fykes of three counts of kidnapping, three counts of robbery in the first degree, one count of unlawful wounding, and one count of battery. The State of West Virginia appeared by Deputy Attorney General Laura Young, on behalf of Attorney General Patrick Morrisey.

This Court has considered the parties' briefs, their oral arguments, and the record on appeal. Upon contemplation of the standard of review, the briefs and arguments, and the record presented, the Court discerns no substantial question of law and no prejudicial error. Consequently, a memorandum decision affirming the order of the circuit court is the appropriate disposition pursuant to Rule 21 of the West Virginia Rules of Appellate Procedure.

The State's evidence at trial revealed that Fykes entered The Stonewall, a Huntington nightclub, at about 3:30 a.m. on January 1, 2012, about thirty minutes after the establishment had closed. Earlier that evening, the club had been packed with patrons celebrating New Year's Eve. Inside, Fykes encountered Keith Combs, the club's owner; Eric Gorczyca, the house deejay and Combs's life partner; and manager Joey Campigotto. Fykes pulled a Lorcin .380 handgun, beat Gorczyca with it, and demanded the cash on the premises. Seizing the victims' cell phones, Fykes took sets of keys from Combs and Campigotto, and he took the wallets of Combs and Gorczyca.

Fykes reiterated his money demand, to which Combs eventually relented by turning over the contents of the office safe, amounting to more than $20,000. Not content to simply take the cash and leave, Fykes pistol-whipped Combs, causing Gorczyca to scream. In retaliation for the outburst, Fykes stomped on Gorczyca's head. Fykes

1

collected the bank bags containing the cash, the personal items he had recovered, and a DVR that was part of the club's security system, leaving the three men tied up in the office.

The entire episode took about an hour, and when Fykes exited the club, the police were outside waiting for him. Kenneth King, the club's bartender, had been leaving when he encountered Fykes in the parking lot on the way in, and the two had exchanged small talk. King reversed course, however, upon discovering that his vehicle had been blocked in. As King reentered the club, he saw the robbery in progress, prompting him to dash back outside and contact the authorities.

When Fykes noticed the officers in the parking lot, he ran. Fykes was quickly caught, but not before he had dropped his pistol, a set of keys, and a bag containing the cash. Gorczyca and Combs were taken to the hospital, where Gorczyca was treated for a broken nose and where he received staples and stitches for a pair of head lacerations. Combs was hurt less seriously, suffering a black eye. By its operative superseding indictment filed November 8, 2012, the grand jury charged Fykes with three counts of first-degree robbery, three counts of kidnapping, and two counts of malicious wounding.

At a motions hearing on November 9, 2012, during a discussion of the parties' proposed voir dire, the defense revealed its theory that the entire sequence of events had been staged with the collaboration of all three victims, presumably for the purpose of collecting an insurance settlement. Trial commenced on February 5, 2013, and, to counter the defense's portrayal of the incident as a sham, the State called the club's insurance agent, who testified that there was no coverage for the robbery or theft of money. On the last of the four days devoted to the guilt phase of the trial, as the prosecution was preparing to conclude its presentation, the parties conferred with the circuit court in chambers to discuss the proposed jury charge.

Counsel for Fykes requested that the jury be instructed on what he termed as "conspiracy." In answer to the court's inquiry whether any evidence of a conspiracy had been presented, counsel responded that the defense would present evidence of an illicit agreement between "William Fykes and Eric Gorczyca[,] and possibly William Fykes, Eric Gorczyca, Keith Combs, and Joe Campigotto." The court pressed the issue, pointing out that "there's not a conspiracy charge in this case. [Fykes is] not charged with conspiring, is he?" Counsel conceded that Fykes was not so charged, and he voluntarily withdrew the instruction.

After the prosecution had rested, Fykes elected to take the stand in his own defense. Fykes testified that he was Gorczyca's cocaine dealer, and, to support that expensive habit, Gorczyca had offered him $5,000 to rob the club and turn over the balance of the proceeds. In anticipation of Fykes's testimony, the prosecution had

2

previously introduced evidence of Gorczyca's convictions about ten years prior for burglary of a residence and for conspiracy to commit the same. Fykes offered no testimony that either Combs or Campigotto had agreed to any scheme to stage the robbery; he could only speculate as to their involvement in the alleged deception by virtue of their presence in the club when the incident unfolded.

On cross-examination, the prosecutor expressed skepticism at the account of events Fykes gave on direct:

> Q:  So this story that you are telling me today, wouldn't
> you agree that this is the first time you have told this
> story to anyone other than your lawyers?
>
> A:  Well, nobody never asked for it. I mean, I didn't get
> an interview from a detective.
>
> Q:  But this is the first time anybody else has heard it other
> than them?
>
> A:  Right.

Fykes was not interviewed by the detectives because, shortly after his arrest, he invoked his Fifth Amendment privilege against self-incrimination and the associated right to counsel. The exchange passed without objection, however, and indeed, at the outset of redirect examination, defense counsel revisited the matter:

> Q:  The police never wanted your side of the story, did
> they?
>
> A:  No.
>
> Q:  They never came to talk to you?
> A:  No.
>
> Q:  People came and took pictures of you but they didn't
> talk to you?
>
> A:  Right.
>
> Q:  Never asked you a question, did they?
>
> A:  No.

3

In accordance with the parties' charging conference, the jury was not instructed on conspiracy, either as a charged offense or as a defense premised on any or all of the alleged victims having colluded with Fykes. Defense counsel nonetheless argued to the jury that the confrontation had been staged. The prosecution's rebuttal rejected any notion of collusion, inviting the jury to draw common-sense inferences to the contrary based on Fykes's failure to wear a mask in the presence of security cameras, his excessive infliction of bodily injury on Gorczyca, and the lack of insurance coverage on the robbery proceeds.

At the conclusion of the parties' arguments, the jury retired to consider its verdict. After the jurors had deliberated for a while, they sent out a note, which the circuit court read out loud as follows: "If we feel this is a conspiracy, does that negate any of the charges[?]" Without soliciting the input of counsel, the court opined that "I cannot answer that for them, obviously." The jurors were immediately recalled, whereupon the court formally addressed the question:

> I cannot answer that for you, that is you are the finders of fact, you must decide based on the evidence that you have heard and the instructions of the Court as given on each of the verdicts that you must deliberate on. So I cannot answer that question for you. That is ultimately one of the ultimate questions in this case, and that is your role to decide that.

After the jury had again left the courtroom, counsel for Fykes spoke up:

> COUNSEL: I don't want to waive any objection, any valid objection I might have here. I'm going to object to that, because I think that —
>
> THE COURT: Object to what, sir?
>
> COUNSEL: I think that you are allowed to instruct them on the law.
>
> THE COURT: Sir, this is the ultimate question. This is asking if they feel there is not a conspiracy does it negate any of the charges. I can't tell them. They have to make those findings of fact whether there was a conspiracy.

4

* * * *

COUNSEL:    Well, the fact is legally it does. If it's a conspiracy, there is no robbery, no kidnapping, no malicious wounding.

THE COURT:    They have to decide that, not me. This question has been submitted to the jury.

COUNSEL:    I'm noting for the record that I think you can instruct them on that.

THE COURT:    I don't think I can. I think you have both submitted your instructions. They must rely on those instructions, and I cannot instruct them further on specific areas of the law that we have not previously dealt with.

The jury deliberated anew for about two and one-half hours before finding Fykes guilty on all three counts of first-degree robbery and on all three counts of kidnapping. With respect to the malicious wounding counts, the jury found Fykes guilty of the lesser-included offenses of unlawful wounding as to Gorczyca, and of battery as to Combs. By special interrogatories, the jury found in addition that Fykes had used a firearm to commit the offenses of conviction. *See* W. Va. Code § 62-12-13(b)(1)(C) (2011) (imposing more stringent parole eligibility requirements on persons convicted of committing robbery and other felonies by use of a firearm). After the proceedings were reconvened and evidence taken relating to sentencing for kidnapping, *see id.* § 61-2-14a(a)(1) (1999), the jury recommended that Fykes be afforded mercy and thereby made eligible for parole on both counts.

Through its amended order of April 4, 2013, the circuit court sentenced Fykes to six consecutive terms of imprisonment aggregating ninety-two years to life, including thirty-two years for kidnapping Campigotto, life with mercy for each of the two other kidnappings, and twenty years on each of the three robbery convictions. Fykes was also sentenced to one to five years in prison on the unlawful wounding conviction, plus six months in jail on the battery conviction, both terms to run concurrently to each other and with the other six.

On April 16, 2013, Fykes noticed the instant appeal from the circuit court's amended order, after which he was appointed different counsel. Fykes maintains that he

5

is entitled to a new trial because the jury was not instructed on his theory of defense that one or more of the alleged victims had colluded with him to stage the entire series of events at The Stonewall. Failing that, Fykes insists that it was plain error for the prosecutor to suggest on cross-examination that his defense had been recently fabricated, insofar as that line of questioning amounted to impermissible comment on the exercise of his constitutional rights. According to Fykes, the prosecutor's transgression requires that his convictions be vacated.

A circuit court's "refusal to give a requested jury instruction is reviewed for an abuse of discretion." Syl. pt. 1, in part, *State v. Hinkle*, 200 W. Va. 280, 489 S.E.2d 257 (1996). Of particular relevance here, a court "by definition abuses its discretion when it makes an error of law." *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 17, 483 S.E.2d 12, 17 (1996). With respect to the prosecutor's questioning, "[t]o trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. pt. 7, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

We begin by examining the extent of the circuit court's obligation to instruct the jury on Fykes's collusion defense, the allegation of error in connection therewith having been adequately preserved for our review.[1] As a general proposition, "a trial court has discretion in determining how best to respond to a jury question." *State v. Davis*, 220 W. Va. 590, 593, 648 S.E.2d 354, 357 (2007) (citation and internal quotation marks omitted). The court may, for example, elect to repeat for the jury an instruction that pertains to the question. *See, e.g.*, syl. pt. 7, *State v. Wyatt*, 198 W. Va. 530, 482 S.E.2d 147 (1996) ("It is usually not error for the trial court to comply with a request of the jury in the matter of re-reading to them instructions that they may wish to hear." (citations, internal quotation marks, and alteration omitted)). Moreover, when the situation indicates, the trial court may decline to answer a jury inquiry. *See State v. Slater*, 222 W. Va. 499, 509, 665 S.E.2d 674, 684 (2008) (ruling that, where confronted with question as to wanton endangerment charge on which jury had been properly instructed on offense elements,

---

[1] The State does not contend to the contrary. The circuit court ruled spontaneously on the jury's question, with no input from the parties. Moreover, defense counsel did object immediately after the jury left the courtroom, at which time any error could have been promptly corrected by recalling the jurors. *See* W. Va. R. Crim. P. 51 (providing that "if a party has no opportunity to object to a ruling or order, the absence of an objection does not thereafter prejudice that party").

6

circuit court was correct to refuse to answer in accordance with defendant's suggested clarification unrelated to those elements).[2]

The court's discretion may be circumscribed, however, to the extent that its response implicates a fundamental right, such as a criminal defendant's due process entitlement to have the jury determine each essential element of the charged offense beyond a reasonable doubt. *See* syl. pt., in part, *State v. Miller*, 184 W. Va. 367, 400 S.E.2d 611 (1990) ("[T]he failure of the trial court to instruct the jury on the essential elements deprives the accused of his fundamental right to a fair trial[.]"); *see also Slater*, 222 W. Va. at 509, 665 S.E.2d at 684 (observing that had defendant "moved for the trial court to re-instruct or re-read the jury on the law of wanton endangerment in light of the jury's confusion over the law, the court would have had a duty to do so") (citing *State v. Lutz*, 183 W. Va. 234, 395 S.E.2d 478 (1988)). For example, in *State v. McClure*, 163 W. Va. 33, 253 S.E.2d 555 (1979), the trial court gave the standard instruction that the jury must not consider the defendant's failure to testify as evidence of guilt. Nonetheless, during its deliberations, the jury asked the court if there were any way the defendant could be persuaded to testify. The court denied counsel's motion to read the instruction again and merely relayed to the jury that its request could not be honored.

We reversed the defendant's conviction, explaining that "where it clearly and objectively appears in a criminal case from the statements of the jurors that the jury has

---

[2] *State v. Woods*, No. 12-0409, 2013 WL 2157813 (W. Va. May 17, 2013) (memorandum decision), on which the State relies, illustrates the principle discussed in *Slater*. The defendant in *Woods* jumped into a car parked at a restaurant, picked up the keys on the front seat, and drove away. After the passenger who had been sleeping in the back seat awoke and began to loudly protest, the defendant eventually pulled over and exited the vehicle. The defendant was indicted for kidnapping and for grand larceny. With respect to the latter charge, the jury asked three questions of the circuit court: "(1) Please define permanently deprive and temporarily deprive, (2) What is the nature of returning the vehicle and what actions are required, and (3) Does the accused have to physically return the car or can the accused assume the vehicle will be returned?" The parties agreed that the first two questions should not be answered, and the court declined the defendant's request to answer the third, referring the jury back to the instruction on the elements of the offense. We affirmed, noting that, of the three questions, the third was "the closest to asking the circuit court to assist the jury in making a finding of fact rather than a pure question of law." *Woods*, 2013 WL 2157813 at *4. Consequently, we held that the circuit court properly exercised its discretion by declining to elaborate on its earlier instructions.

failed to comprehend an instruction on a critical element of the crime or a constitutionally protected right, the trial court must on request of defense counsel, reinstruct the jury." *Id.* at 37, 253 S.E.2d at 558; *see Lutz*, 183 W. Va. at 236–37, 395 S.E.2d at 480–81. The jury in this case did not fail to comprehend its instructions on any critical element of the crime or with respect to any constitutionally protected right. Counsel for Fykes withdrew his tender of a conspiracy instruction, and he did not thereafter request that the jury be given an instruction indicating that any conspiracy or collusion involving the victims was a defense to the charges. Therefore, there was no error. The jury's question in no way demonstrated that it had "failed to comprehend an instruction" read to it.

Fykes's arguments relating to the prosecutor's questions are more easily disposed of. The error complained of traces back to our decision in *State v. Boyd*, 160 W. Va. 234, 233 S.E.2d 710 (1977). In *Boyd*, a murder prosecution, the defendant took the stand to explain that he had shot the victim in self-defense. On cross-examination, the prosecutor asked the defendant why he had made no claim of self-defense following his arrest. The circuit court overruled a defense objection to the question, but it cautioned the jury that the defendant was under no obligation to make any such statement prior to trial. We reversed the defendant's conviction and remanded for a new trial. In so doing, we cited the United States Supreme Court's decision in *Doyle v. Ohio*, 426 U.S. 610 (1976), for the proposition that "the constitutional right to remain silent carries with it the principle that a defendant cannot be impeached at trial by his pre-trial silence." *Boyd*, 160 W. Va. at 239, 233 S.E.2d at 715.

The prosecutor's inquiry on cross-examination of Fykes concerning his post-arrest silence is materially indistinguishable from that we deemed erroneous in *Boyd*, the only salient difference being that the irregularity in the instant matter was not preserved by timely objection. However, we may set aside Fykes's convictions for plain error upon ascertaining that the complained-of defect was sufficiently prejudicial to have affected his substantial rights, that is, the error "must have affected the outcome of the proceedings in the circuit court." Syl. pt. 9, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

Reversal here is not warranted because Fykes suffered no appreciable prejudice as a result of the prosecutor's questioning. The evidence of guilt was overwhelming, and, more compellingly, defense counsel continued to explore the subject on redirect in an attempt to explain his client's silence. To the extent that the defense itself continued to focus the jury's attention on the matter, any prejudice visited upon Fykes as the result of the prosecutor's actions was necessarily attenuated. *Cf. State v. Ramsey*, 209 W. Va. 248, 545 S.E.2d 853 (2000) (no plain error where defendant's post-arrest silence, recounted at trial by investigating officer, occurred prior to administration of *Miranda* warnings).

For the foregoing reasons, we affirm.

8

Affirmed.

**ISSUED: June 10, 2016**

**CONCURRED IN BY:**
Chief Justice Menis E. Ketchum
Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Margaret L. Workman
Justice Allen H. Loughry II