697 S.E.2d 722

STATE ex rel. Stephen P. BOWERS,
Petitioner Below, Appellee

v.

Thomas SCOTT, Administrator, South-
western Regional Jail; and Wyetta Fre-
dricks, Director, West Virginia Regional
Jail and Correctional Facility Authority,
Respondent Below, Appellants.

No. 34972.

Supreme Court of Appeals of
West Virginia.

Submitted Feb. 10, 2010.

Decided March 4, 2010.

Jeffrey D. Cramer, Esq., Marshall County Prosecuting Attorney, Moundsville, WV, Attorney for the Appellants.

J.L. Hickok, Esq., West Virginia Public Defender Services, Charleston, WV, Attorney for the Appellee.

PER CURIAM:

The Appellants (hereafter "State") seek reversal of an order of the Circuit Court of Marshall County granting habeas corpus relief to the Appellee (hereafter "Defendant"). The circuit court held that the Defendant had received ineffective assistance of counsel in his criminal trial and that the outcome of the case would have been favorable to the Defendant if the Defendant had received effective assistance of counsel. Having fully considered the record and argument of counsel, we reverse the circuit court and order the Defendant immediately remanded into custody.

## I. Background

On November 12, 2002, the Defendant was indicted by a Marshall County Grand Jury on three counts of Sexual Abuse by a Guardian, one count of Sexual Abuse in the First Degree and two counts of Sexual Abuse in the Third Degree.

The facts show that the Defendant was a deputy sheriff in the Ohio County Sheriff's Department and held the rank of Sergeant. The Defendant was also a coach of a Glen Dale, West Virginia, little league baseball team. This team was comprised of young boys in the eleven- to twelve-year-old age group. The indictment alleges that the sexual offenses were committed against three of the team's young boys; D.G., M.K., and C.C.

### Undisputed Facts Relevant to D.G.

At trial, the undisputed evidence relevant to D.G., an eleven-year-old player on the Defendant's little league baseball team, was that the Defendant went to D.G.'s home and asked D.G.'s father if he could teach D.G. some new stretching exercises. D.G.'s father agreed, but said D.G. was at a nearby park playing. D.G.'s father told the Defendant that he was leaving but would return later. The Defendant found D.G. in the park and drove D.G. back to D.G.'s house, by which time D.G.'s father had already left.

Once in the house, the Defendant instructed D.G. to take a hot bath to loosen himself up. A few minutes later, while D.G. was still in the bathtub, the Defendant entered the bathroom and watched D.G. as he got out of the bathtub and toweled himself dry. The Defendant then told D.G. to go to his bedroom. Once in the bedroom, the Defendant had D.G. remove the towel that the boy had placed around himself. D.G. complied. At this point, the Defendant began measuring D.G.'s inseam with a cloth tape, during which the Defendant touched and moved D.G.'s testicles to the side. The Defendant then recorded the measurements in a small notebook that had "pictures of boys and girls naked in it." In his statement to investiga-

tors, D.G. said that the pictures of the boys "had a penis."

After taking the measurement, the Defendant then had D.G. perform the stretching exercises in the nude. These exercises included having the boy bend over at the waist and touch his toes and having the boy stretch against the wall. After a series of these "exercises," the Defendant again cupped the boys testicles, which D.G. testified was "like a doctor would."

After cupping the boy's testicles, the Defendant instructed D.G. to go and lay down on his bed. The boy complied, at which time the Defendant further instructed the boy lay on his stomach. With D.G. laying nude on the bed, the Defendant opened a bag that he had brought with him and took out a bottle of lotion. The Defendant then began rubbing the lotion all over the backside of the boy's body, including his nude buttocks. After a period of time doing this, the Defendant then instructed D.G. to turn over, at which time the Defendant began rubbing lotion over the front side of the boy's nude body. When the Defendant got to the boy's genital area, D.G. told the Defendant that he needed to go to the bathroom and D.G. got up and went into the bathroom. A short time later, D.G. returned to the room, at which time the Defendant told D.G. that he should not be embarrassed about his penis size because he, the Defendant, had seen sizes bigger and smaller. D.G. was eleven-years-old at the time.

### Undisputed Facts Relevant to M.K.

The undisputed facts relevant to M.K. are a virtual repeat of those relevant to D.G. M.K., a twelve-year-old player on the Defendant's little league baseball team, asked his mother if he could go to the Defendant's house to learn the new stretching exercises that the Defendant had previously mentioned to both M.K. and M.K.'s mom. M.K.'s mom agreed, stating that she had to leave to get M.K.'s sister and would return in a short time.

M.K. went to the Defendant's house, and was led to the basement area where the Defendant told M.K. to get into a bathtub that the Defendant filled with hot water. Again, the auspices of the bath was to loosen the boy up. While M.K. was in the tub, the Defendant entered the bathroom and watched as M.K. got out of the tub and toweled himself dry. The Defendant then took the towel and told M.K. to go into an outer area of the basement where he then had the boy, while the boy was nude, perform stretching exercises. These "exercises" included having the boy lay prone and arch his back, and—while in a standing position—having the boy spread his legs apart, bend over and touch his toes. The Defendant sat on his sofa and watched as the boy performed these "exercises."

At some point, the Defendant got off the sofa and told the boy that he was going to check his height, weight "and all the EMT stuff he was supposed to do." The Defendant also told M.K. "I've done this to other kids and you shouldn't worry about it." During this "EMT" procedure, the Defendant "grabbed [M.K.'s] testicles" and held them for a couple of seconds. After letting go of the boy's testicles, the Defendant then proceeded to grab both cheeks of the boy's bare buttocks and began rubbing them. At this point, a knock on a door could be heard from upstairs. The Defendant initially tried to ignore the knocking, but it became more persistent and M.K.'s mother could be heard asking for M.K. At this point the Defendant instructed M.K. to hurry up and get dressed. M.K. was twelve-years-old at the time.

### Undisputed Facts Relevant to C.C.

In 2002, shortly before the beginning of the baseball season, the Defendant held a "team meeting." However, the team meeting was broken into age groups, with the eleven-year-old boys in one group, and the twelve-year-old boys in another group. On the night of the meeting for the twelve-year-old boys, the Defendant instructed all parents to leave and return in about an hour. After the parents left, the Defendant had all of the boys proceed to the Defendant's basement. Once all the boys were in the basement, the Defendant instructed them to drop their pants because he (the Defendant) needed to "measure" them for their uniforms. When one boy protested, the Defendant informed all of the boys that if they did not get

measured, they could not play on the team. The boys then proceeded to where the Defendant was sitting, and the Defendant then measured each boy's inseam and recorded them in his book. C.C. testified that when the Defendant measured his inseam, that the Defendant touched C.C.'s testicles through his underwear. The Defendant, while professing not to recall touching C.C.'s testicles, said that it was possible. C.C. was twelve years old at the time.

## The Investigation, Trial and Habeas Corpus Proceedings

After the team meetings, one of the parents learned about what had occurred and, concerned, went to the Defendant's employer to express those concerns. The Defendant's employer, the Sheriff of Ohio County, said that they had no jurisdiction to investigate the event since it occurred in Marshall County, but that he would refer the case to the appropriate officials. Thereafter, Sgt. David Robinson of the West Virginia State Police was assigned to investigate the complaint.

Sgt. Robinson took statements from most of the boys (some parents declined to let their boys be interviewed). After getting the statements, Sgt. Robinson asked that the Defendant to come in for an interview, which the Defendant agreed to do after he finished his shift. The record reflects that Defendant showed up for his interview wearing his deputy sheriff uniform, as well as his duty belt and service firearm. The Defendant signed a Miranda Waiver form and was interviewed.

During the interview, the Defendant admitted to the events described above relevant to M.K. The Defendant also admitted to measuring the boys at the team meeting, but did not recall touching C.C.'s testicles, although the Defendant admitted that it was possible he had. When asked during the interview if he "had ever sexually abused another person" the Defendant replied "Yes, D.G. approximately 2yrs ago, he was 12yrs old. I had him working out at his house on weights. I had him take a bath, I had him run through the exercises, he had a towel on, it came off." The Defendant was next asked "How did you touch D.G.?" to which the Defendant responded "I don't recall, I believe I touched his testicles, I don't recall if I touched his penis, I don't think so." Prior to these admissions, Sgt. Robinson was unaware of the event with D.G. During the interview, the Defendant admitted that his conduct likely constituted sexual abuse, but claimed it was not his intent.

Shortly after the interview, the Defendant checked himself into a mental health facility citing depression. While in the mental health facility, Sgt. Robinson consulted with the Marshall County Prosecuting Attorney's Office and obtained permission to obtain an arrest warrant for the Defendant. Sgt. Robinson executed the warrant upon the Defendant's release from the mental health facility.

The Defendant was indicted and elected to have a trial by jury, at which time M.K., D.G., and C.C. each testified to the events described above. In addition, M.K.'s mother testified that she had to knock several times when she went to retrieve her son, and that she was disturbed when she saw her son putting on his shirt. Suspecting that something had occurred, M.K.'s mother testified that she asked M.K. what had happened, and it was only after a period of time that M.K. recounted the events to her. M.K.'s mother further testified that she decided not to report the incident because the Defendant was a deputy sheriff and she did not want M.K. to suffer the embarrassment. Instead of reporting the incident, she did not allow M.K. to be alone with the Defendant.

Other witnesses included current and former little league coaches (who also were parents of the children involved) who testified that there was no reason for measuring the boys inseams' because the boys' uniform pants came in three sizes-small, medium and large. These witnesses testified that fitting days usually consisted of telling the boys to pick their size out of a box at the ballfield and that the boys would then either go into the woods and try them on or that blankets would be draped between vehicles at the ball park for a fitting area.

The Defendant testified, and admitted to the events surrounding D.G. and M.K., but professed that none of his acts was done for the purpose of sexual gratification or pleasure. With regard to the "team meeting"

and measuring the boys, the Defendant similarly admitted to the events, but claimed that he did not recall having touched C.C.'s testicles. The Defendant testified that he did not conduct those measurements for purposes of sexual gratification or pleasure.

The case was submitted to the jury. After deliberating approximately five hours (excluding breaks), the jury returned its verdict finding the Defendant guilty on all counts. The trial court thereafter sentenced the Defendant to 10–20 years imprisonment on each of the Sexual Abuse by Guardian counts, 1–5 years on the Sexual Abuse in the First Degree count, and 90–days on each Sexual Abuse in the Third Degree counts, with some sentences to run concurrently and some consecutively, for an effective sentence of 11–25 years imprisonment.

The Defendant filed an appeal to this court following sentencing, which was refused. The Defendant then appealed to the United States Supreme Court, which appeal was refused. Thereafter, the Defendant filed a *pro se* habeas corpus petition to the Circuit Court of Marshall County alleging, *inter alia,* ineffective assistance of counsel. The circuit court appointed legal counsel to represent the Defendant and an evidentiary hearing was conducted. The circuit court found that the Defendant had received ineffective assistance of counsel and that "it was clear that there would have been a favorable outcome for the [Defendant] had he received effective representation and the Prosecuting Attorney not overreached in his questions and arguments." Based on those findings, the circuit court granted the habeas petition "with prejudice," noting that by "with prejudice" it was holding that the "State is precluded from prosecuting the [Defendant] for any of the crimes charged in the indictment." The circuit court ordered the Defendant's immediate release from custody. A stay was not entered by the circuit court and the Defendant was released with no conditions. The State thereafter filed this Appeal seeking reversal of the circuit court's order and seeking an order returning the Defendant into custody to serve the remainder of his sentence.

## II. Standard of Review

■ Our standard of review for appeals arising from a circuit court's findings of fact and conclusions of law in a habeas corpus proceeding is set forth in Syllabus Point 1, *Mathena v. Haines,* 219 W.Va. 417, 633 S.E.2d 771 (2006), where we held:

In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

With these standards in mind, we address the issues before us.

## III. Discussion

In this appeal, there are two distinct findings by the circuit court: first, that the Defendant received ineffective assistance of counsel; and second, that had it not been for the ineffective assistance of counsel, there likely would have been a different outcome of the Defendant's case. We address these findings separately.

The circuit court found that the Defendant received ineffective assistance of counsel on several grounds. These grounds are that Defendant's trial counsel: (1) failed to adequately prepare for trial by not having the Defendant evaluated by a psychologist; (2) failed to move that the trial court edit or redact prejudicial and irrelevant portions of the Defendant's videotaped confession to law enforcement investigators before that video was published to the jury; (3) invited, by way of questioning of a state witness, the introduction of otherwise inadmissible evidence that there were other unnamed victims for which the Defendant had not been charged in the indictment; (4) failed to object to multiple inappropriate questions asked by the prosecutor to state witnesses, which resulted in the witnesses testifying to inappropriate and prejudicial issues; (5) committed the Defendant to testifying by stating in his opening statement that the Defendant would testify, which error was compounded by the fact that trial counsel failed to properly prepare the

Defendant for such testimony; (6) failed to object to multiple inappropriate questions asked of the Defendant by the prosecutor during cross examination; (7) failed to offer an instruction on the definition of "custodian" as defined for the offenses set forth in the indictment; (8) failed to object to the prosecutor's inappropriate comment made during closing argument regarding the Defendant's exercise of his right to assistance of counsel; and (9) failed to object to other prosecutorial misconduct committed during the prosecutor's closing argument.

■ In Syllabus Point 5, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995), we held that:

In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

For clarity, we separately apply *Miller*'s two-pronged standard to the facts of the case before us.

**A. Whether Trial Counsel's Performance was deficient under an objective standard of reasonableness.**

■ Initially, we note that:

In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

Syllabus Point 6, *Miller, Id.*

After carefully reviewing the record and briefs of the parties, we conclude that it is unnecessary for us to decide whether the circuit court was correct in each of its ineffective of assistance of counsel findings. Even if we assume that ineffective assistance of counsel occurred in this case, we do not believe—under the facts of this specific case—"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syllabus Point 5, *Miller, supra.*

**B. Whether there is a reasonable probability that the result of the proceedings would have been different.**

■ Assuming that trial counsel's performance was deficient under an objective standard of reasonableness, we do not find "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syllabus Point 5, *Miller, supra.*

In reaching this conclusion, we initially note that our cases define the standard "reasonable probability" as being a "probability sufficient to undermine confidence in the outcome." *State v. Layton*, 189 W.Va. 470, 487, 432 S.E.2d 740, 757 (1993) (Citations omitted.). This same standard is also applied in our analysis of claims involving the State's failure to disclose evidence to the defendant. *See State v. Fortner*, 182 W.Va. 345, 353, 387 S.E.2d 812, 820 (1989), where we noted that suppressed evidence:

... is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.

Having thoroughly considered the record, it is clear to this Court that there was virtually no probability—reasonable or otherwise—that the outcome of the Defendant's trial would have been different "but for" trial counsel's deficient representation.

The indictment charged the Defendant for offenses committed against three youthful victims. The undisputed admissible evidence adduced at trial demonstrates as follows:

The Defendant confessed. The Defendant confessed on not just one occasion, but on two occasions. The first confession was to Sgt. Robinson during the investigation of the offenses (which confession was published to the jury), and the second confession came through the Defendant's testimony at his trial. The Defendant confessed that he rubbed lotion on the nude body, including the nude bottom, of eleven-year-old D.G., and that he touched D.G.'s testicles. The Defendant confessed that he had twelve-year-old M.K. perform "strengthening exercises" in the nude, in front of the Defendant, and that he touched the M.K.'s testicles. The Defendant confessed that he had twelve-year-old C.C. drop his pants in front of him while he "measured" his inseam. To the extent that the Defendant's confessions alone were not enough, each of the three young boys involved testified at the Defendant's trial.

D.G. testified to having been told by the Defendant to get in a bath, and thereafter to the Defendant's having him perform "exercises"—nude—while the Defendant watched. After the exercises, that the Defendant performed *faux* "EMT" procedures, as well as measured the boy's body, recording those measurements in a small notebook that had "pictures of boys and girls naked in it." D.G. further testified that the Defendant took D.G.'s testicles in his hand, holding them. Additionally, said the Defendant rubbed lotion on his bare buttocks and over other portions of his body.

M.K. testified that the Defendant had done almost the exact same thing to him as the Defendant had done to D.G. A distinguishing factor was that the Defendant lounged on his sofa while watching this young boy perform "exercises" in the nude, including bending over at the waist with his legs spread.

C.C. testified that at the team meeting described *supra*, the Defendant told all the boys that they must drop their pants if they wanted to play on the Defendant's little league team. The auspices for needing to have the boys drop their pants was to allow the Defendant to measure them for their uniform pants. C.C. testified that the Defendant touched his (C.C.'s) testicles through his underwear while the Defendant measured him. The Defendant did not deny that this occurred.

P.D., one of the boys at the "team meeting," also described the events that occurred, including testifying that the Defendant told the boys, when one protested having to drop their pants, that "If you don't strip down then you won't be playing this year." Towards the end of the meeting, P.D. said that the Defendant told all the boys "Everything that happens stays here."

D.G.'s father also testified. Mr. G testified that the team meeting had been scheduled to take place at one of the local ballfields, and that Mr. G was to deliver the team uniforms to the ballfield where the fittings would take place. Mr. G testified that when he got to the ballfield, no one was there. Asking people who were at the ballfield if they knew where the team was, Mr. G was told that the Defendant had moved the meeting to his house. When Mr. G arrived at the Defendant's house, the meeting had ended. Mr. G had the boys' uniforms, including the pants, with him. Mr. G further testified that he had been coaching the little league teams since 1982, and that they had never measured the inseams of the boys to fit them for their uniform pants.

All of the charged offenses in the Defendant's indictment required a finding of sexual contact. Sexual contact, as defined by *W.Va. Code*, 61–8B–1(6) [2000], *was*[1] defined in as follows:

> "Sexual contact" means any intentional touching, either directly or through clothing, of the anus or any part of the sex organs of another person, or the breasts of a female or intentional touching of any part of another person's body by the actor's sex organs, where the victim is not married to the actor and the touching is done for the purpose of gratifying the sexual desire of either party.

---

1. The Legislature in 2007 amended this provision to include additional ways in which sexual contact could be committed. These amendments are not relevant to this case given that all of the alleged acts occurred prior to these amendments.

In addition to sexual contact, the charged offenses of Sexual Abuse in the First Degree required a finding that the Defendant was more than fourteen years old and the victim less than twelve years old. Sexual Abuse in the Third Degree required a finding, in addition to sexual contact, that the defendant was four or more years older than the victim and that the victim was less than sixteen years old. Sexual Abuse by a guardian required, in addition to a finding of sexual contact, that the Defendant was a parent, custodian or guardian at the time of the charged offenses.

The factual basis for a jury's finding of "sexual contact" is very clear from our summary of the undisputed facts of this case. The Defendant admits to having touched the testicles of two of these young boys, but denied that the touching was for purposes of sexual gratification. The Defendant does not recall, but did not deny, touching C.C.'s testicles through his underwear when measuring him at the team meeting. On the other hand, C.C. testified that the Defendant did touch his testicles through his underwear.

An *effective* attorney could not have excluded the undisputed evidence and confessions from being introduced at trial. A reasonable jury could easily conclude that the entire "meeting" and the touching of the three young boys constituted proof of sexual contact for the purpose of Defendant's sexual gratification.

█ With regard to the three counts of sexual abuse by a guardian set forth in the indictment, the operative definition in effect at the time of the offenses was set forth in *W.Va.Code,* 61–8D–l(4) [1998], which defined a "custodian" as

... a person over the age of fourteen years who has or shares actual physical possession or care and custody of a child on a full-time or temporary basis, regardless of whether such person has been granted custody of the child by any contract, agreement or legal proceeding. "Custodian" shall also include, but not be limited to, the spouse of a parent, guardian or custodian, or a person cohabiting with a parent, guardian or custodian in the relationship of husband and wife, where such spouse or other person shares actual phys-

ical possession or care and custody of a child with the parent, guardian or custodian.

The record shows that M.K. was left alone in the Defendant's care by M.K.'s mother who temporarily entrusted her son into the Defendant's care. D.G.'s father also temporarily entrusted his son into the Defendant's care. C.C. was also left in the Defendant's temporary care when the Defendant ordered that the parents could not attend the team meeting and were to come back later. The Defendant, a deputy sheriff and little league baseball team coach, was trusted by not only the boys' parents, but by the boys—he was "Coach." Under these undisputed facts, a reasonable jury could easily find that the Defendant had "actual physical possession or care and custody of a child on a ... temporary basis" and during that period the Defendant subjected the boys to sexual contact.

## IV. Conclusion

We conclude that the circuit court was clearly wrong in finding that there was a reasonable probability, but for trial counsel's ineffective assistance of counsel, that the outcome of the Defendant's case would have been different. There simply is no support for that conclusion based on the undisputed relevant evidence in this case—evidence that is so strong that it brings to mind a comment made by the United States Supreme Court in *Kansas v. Ventris,* 556 U.S. ——, ——, 129 S.Ct. 1841, 1846, 173 L.Ed.2d 801 (2009), where it was aptly noted that:

A defendant is not denied counsel merely because the prosecution has been permitted to introduce evidence of guilt—even evidence so overwhelming that the attorney's job of gaining an acquittal is rendered impossible. In such circumstances the accused continues to enjoy the assistance of counsel; the assistance is simply not worth much.

Accordingly, for the reasons set forth herein, we reverse the order of the Circuit Court of Marshall County. It is ordered that the Defendant is immediately remanded into custody pursuant to the sentencing order entered in the criminal proceeding *sub judice.* The circuit court shall enter an Amended

Sentencing Order reflecting the Defendant's actual time served, but no credit shall be given for any portion of the time that the Defendant has been free pursuant to the circuit court's December 28, 2008, order.[2] The Clerk of this Court shall issue our mandate forthwith.

Reversed.

---

2. The Defendant was immediately released pursuant to the circuit court's December 28, 2008, order. A stay was not sought by the State.