No. 12-1028 - David Ballard, Warden v. Brian Bush Ferguson

**FILED**

**October 25, 2013**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LOUGHRY, Justice, dissenting:


The majority has utterly disregarded the United States Supreme Court's clearly-expressed directive in assessing allegations of failure to investigate relative to ineffective assistance of counsel; in so doing, it has laid waste to the considerable efforts and resources of the State and the jury in bringing Mr. Ferguson to justice. Moreover, under the auspices of ensuring Mr. Ferguson's right to a Constitutionally-compliant trial, it has sullied the reputation of his defense attorney who zealously and effectively represented him. The defense attorney's rationale for his trial decisions was not only reasonable, based on the information known at the time, but the evidence in contention played out precisely as he predicted in the habeas proceedings below. In addition to the majority's improper second-guessing of the reasonable strategic decisions of trial counsel, it then comes to the wildly speculative conclusion that Mr. Ferguson would have more likely than not been acquitted of first-degree murder had his defense attorney injected completely incredible witnesses into the proceeding. For these reasons, I dissent.

1

## *I. The First Prong of Strickland*

Claims of ineffective assistance of counsel are governed by the objective standard of review[1] set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and as adopted by this Court in *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).[2] The majority's finding that Mr. Zimarowski's representation was constitutionally deficient was based solely on the fact that he failed to independently investigate the statement of a witness, Mary Linville, which inculpated a third party, Robert Coles. In that regard, *Strickland* explicitly provides that

---

[1]Syllabus point six of *Miller* holds:

> In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

194 W.Va. at 6-7, 459 S.E.2d at 117-18.

[2]"In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Miller,* 194 W.Va. at 6, 459 S.E.2d at 117, syl. pt. 5.

counsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary*. In any ineffectiveness case, a particular decision not to investigate must be directed assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 691 (emphasis added).

In *Miller*, this Court cautioned that as a result of the rules and presumptions established in *Strickland* and its progeny, "the cases in which a defendant may prevail on the ground of ineffective assistance of counsel are few and far between one another." 194 W.Va. at 16, 459 S.E.2d at 127. The Court explained that

[t]his result is no accident, but instead flows from deliberate policy decisions this Court and the United States Supreme Court have made mandating that "[j]udicial scrutiny of counsel's performance must be highly deferential" and prohibiting "[i]ntensive scrutiny of counsel and rigid requirements for acceptable assistance[.]" *Strickland*, 466 U.S. at 689-90, 104 S.Ct. at 2065-66, 80 L.Ed.2d at 694-95. In other words, we always should presume strongly that counsel's performance was reasonable and adequate. A defendant seeking to rebut this strong presumption of effectiveness bears a difficult burden because constitutionally acceptable performance is not defined narrowly and encompasses a "wide range." The test of ineffectiveness has little or nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We only ask whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at the time, in fact, worked adequately.

3

*Id.* Mr. Zimarowski's testimony at the habeas hearing established that he certainly acted within the "wide range" of reasonable representation under the circumstances. The majority accords his decision to not independently investigate the alleged confession of Robert Coles absolutely none of the deference required by *Miller/Strickland*.

To that end, it appears that the majority conducted its analysis in a vacuum, turning a blind eye to the totality of the circumstances that Mr. Zimarowski was confronted with when preparing for trial and formulating his defense strategy. In order to properly assess whether Mr. Zimarowski's decision to not pursue an independent investigation of the alleged confession of Robert Coles was reasonable, *Miller/Strickland* requires the reviewing court to consider whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. 194 W.Va. at 6-7, 459 S.E.2d at 117-18; syl. pt. 6, in part. In that regard, this Court has held:

> In determining whether counsel's conduct falls within the broad range of professionally acceptable conduct, this Court will not view counsel's conduct through the lens of hindsight. Courts are to avoid the use of hindsight to elevate a possible mistake into a deficiency of constitutional proportions. Rather, under the rule of contemporary assessment, an attorney's actions must be examined according to what was known and reasonable at the time the attorney made his or her choices.

Syl. Pt. 4, *State ex rel. Daniel v. Legursky* 195 W.Va. 314, 465 S.E.2d 416 (1995).

### *A. The State's Evidence*

4

At the time Mr. Zimarowski made his decision to not further investigate Ms. Linville's claim that Robert Coles confessed to the murder of Mr. Wilkins, he knew that the State possessed a considerable amount of evidence against Mr. Ferguson. In fact, it is fair to say that the State had *overwhelming* evidence that pointed to Mr. Ferguson's guilt. In order to evaluate Mr. Zimarowski's decision in the proper context, it is necessary to consider the evidence that the State possessed against Mr. Ferguson that was ultimately presented to the jury at trial.

The State's evidence showed that Mr. Ferguson began exhibiting animosity toward Mr. Wilkins more than a year before the murder occurred. Mr. Ferguson was apparently jealous of Mr. Wilkins's friendship with his girlfriend, Ebony Gibson. This resulted in the first incident between the two men during which Mr. Ferguson brandished a knife while riding in a car with Ms. Gibson driving and Mr. Wilkins in the back seat. Mr. Ferguson threatened Mr. Wilkins and advised him to stop calling Ms. Gibson. Mr. Wilkins immediately told at least four of his friends that Mr. Ferguson had pulled out a knife and threatened him. At trial, these friends relayed the incident to the jury. Both Ms. Gibson and Mr. Ferguson denied that Mr. Ferguson had pulled a knife on Mr. Wilkins when they testified at trial. However, the State impeached Ms. Gibson's testimony by calling her friend, Adrienne Batkins, as a rebuttal witness. Ms. Batkins testified that Ms. Gibson told her about the knife incident when it happened, stating that Mr. Ferguson had confronted Mr. Wilkins and pulled a knife while riding in her car.

Another incident occurred between Mr. Ferguson and the victim approximately three months before the murder. At that time, Mr. Ferguson attempted to attend a party at a fraternity, of which Mr. Wilkins was a member. When Mr. Ferguson showed up, Mr. Wilkins's fraternity brothers, who were aware of the knife incident, asked Mr. Ferguson to leave the party. As they were escorting him to the door, Mr. Ferguson elbowed one of the fraternity brothers who then punched Mr. Ferguson. Mr. Ferguson then stated, "Don't worry. I am going to get Jerry when his fraternity brothers are not here." As Mr. Ferguson walked down the street away from the party, he again said that he would get Mr. Wilkins. Mr. Ferguson's friend, Brian Johnson, who went with him to the party and observed this altercation, testified that Mr. Ferguson was upset about the encounter and told him that he would fight Mr. Wilkins if he saw him by himself.

Sometime thereafter, Mr. Wilkins had a conversation with one of his fraternity brothers, Solomon Wright. At trial, Mr. Wright testified that Mr. Wilkins expressed concern about the possibility of an upcoming physical conflict with Mr. Ferguson. Mr. Wilkins told Mr. Wright that if anything happened to him, he (Mr. Wright) would know who did it, i.e., Mr. Ferguson.

In the days and weeks before Mr. Wilkins was murdered, Mr. Ferguson was observed sitting in his vehicle (a highly recognizable gold Lexus) in the parking lot just

outside Mr. Wilkins's apartment. In addition, Mr. Wilkins had told his friends that Mr. Ferguson had been following him.

The jury learned that on the evening of the murder, around 7:00 p.m., Mr. Wilkins was accosted by the shooter as he emerged from his apartment building. Mr. Wilkins was chased across the parking lot by the shooter who was wielding a long handgun, silver in color. Mr. Wilkins eventually lost his footing and fell down beside a car sitting at a stop sign at an intersection near the apartment building. The driver of the car, Kathryn Metcalfe, watched as the shooter approached Mr. Wilkins and shot him in the back as he lay on the ground. The shooter then ran away in the direction of the West Virginia University Recreation Center.

In addition to Ms. Metcalfe, the shooter was observed by three other witnesses. All of the witnesses gave height and weight descriptions that matched Mr. Ferguson which was 6'1" to 6'2" in height and 180 to 210 pounds. In addition, the shooter was observed to be wearing a dark, hooded jacket (black or blue) and black pants.

The police located Mr. Ferguson at his girlfriend's residence in the hours after the shooting and obtained consent to search his vehicle and apartment. The police collected a navy, hooded jacket and a black, hooded sweatshirt from Mr. Ferguson's vehicle that were

7

similar to the witnesses' descriptions of the shooter's attire. Forensic testing conducted by the police revealed traces of gun powder on these items of clothing.

The police also discovered that Mr. Ferguson was near the scene of the shooting shortly after it occurred. Mr. Ferguson told the police that he went to the West Virginia University Recreation Center around 7:00 p.m., and then went to visit his friend, Brian Johnson, before going to Ms. Gibson's residence for dinner. However, Brian Johnson said in his statement to the police that he had not seen Mr. Ferguson the day of the shooting. In addition, data retrieved from the entry system at the West Virginia University Recreation Center, located approximately one mile from where the shooting happened, showed that Mr. Ferguson arrived there at 7:39 p.m. that evening, not 7:00 p.m. Prior to that night, Mr. Ferguson had only been at the recreation center nine days between August 2001 and February 2, 2002. While at the recreation center, Mr. Ferguson was observed by witnesses as wearing clothing matching the description of the attire worn by the shooter including black sweat pants, which he told the police he had not been wearing and did not own. Mr. Ferguson told the police that he swam at the recreation center and showered at Ms. Gibson's apartment that evening before they arrived to question him.

Mr. Ferguson accompanied the investigating detectives to the police station that evening to answer questions. Mr. Ferguson exhibited a calm demeanor until he was advised that the police intended to perform gun shot residue sampling on his person and clothing.

At that point, he became visibly agitated and began to sweat and cough. Prior to the test, he was observed by detectives vigorously wiping his hands on his jacket when he thought they were not looking at him.[3] On the way to the police station, Mr. Ferguson had told the police that he only owned one firearm, a Desert Eagle, and that he had not fired *any* firearm in more than a year.[4] The next day, however, he called to report that a 9 mm handgun that he had only purchased nine days earlier had been stolen from his apartment. He said he had forgotten about the gun when he spoke to the detectives the previous evening and could not remember when he last saw the gun, nor did he know how it was stolen because there were no signs of forced entry into his apartment.

At trial, the State's firearms expert testified that the bullet fragments taken from the victim's body came from a .44 caliber bullet. In addition, Mr. Ferguson's friend, Brian Johnson, testified that he had seen a large revolver with a stainless steel finish in Mr. Ferguson's apartment within two weeks of Mr. Wilkins's murder. Mr. Ferguson had told Mr. Johnson that the gun was a "magnum" and described it as a "powerful" gun. Mr. Johnson

---

[3]No gunshot residue was detected on Mr. Ferguson's hands and face. At trial, a member of the trace evidence section of the State Police Crime Lab testified that gunshot residue can be removed by rubbing it away, brushing it away, swimming, showering, or simply with time and activity.

[4]Although Mr. Ferguson told the police detectives that he had not fired a gun in more than a year, at trial, two of Mr. Ferguson's friends from the Washington, D.C. area testified that in late January or early February 2002, Mr. Ferguson returned home for a visit and showed them two, brand new guns and proceeded to test fire both of them.

stated that this was not the Desert Eagle firearm with which he was familiar because he had been with Mr. Ferguson when he purchased the Desert Eagle.  Mr. Johnson further testified that after the shooting, Mr. Ferguson told him that the murder weapon was "long gone, that police had no eyewitnesses to identify the perpetrator and that there was no gunshot residue."  As discussed above, the police actually found the presence of gunshot residue on the jacket and sweatshirt retrieved from Mr. Ferguson on the night of the murder.  The police also found a .44 magnum casing lying loose at the bottom of a dumpster located outside Mr. Ferguson's residence.  The dumpster also contained a bag of trash that had belonged to Mr. Ferguson.

### B.  The Alleged Confession of Robert Coles

With these facts and evidence in mind, the police report given to Mr. Zimarowski discussing Ms. Linville's statement regarding the alleged confession of Robert Coles must now be considered.  The report indicated that in a statement to the police, ten months after the murder, Ms. Linville said that *two days after Mr. Wilkins was murdered*, while she was at a trailer belonging to a woman named Spring King, Robert Coles showed up and said, "Know that Jerry kid in the paper that got shot, I shot him."  According to Ms. Linville, Robert Coles said that the police did not know what they were talking about because he shot him in the chest and not the back and that he had shot Jerry Wilkins because he did not like the way he looked at him.  The police report further indicated that Ms. Linville gave her statement in a drug debriefing after she had been arrested in a federal drug sweep.

10

Finally, the report stated that the police had interviewed Mr. Coles and not only had he denied making the confession, but that he had passed a polygraph test.

### C. Mr. Zimarowski's Defense Strategy

In order to determine whether or not there was a reasonable basis for Mr. Zimarowski's decision not to conduct any further investigation into the alleged confession of Robert Coles as reported by Ms. Linville, it is necessary to consider whether or not such evidence would have been consistent with Mr. Zimarowski's theory of the case and whether or not such evidence could have been more harmful to Mr. Ferguson's defense than helpful. During the habeas hearing, Mr. Zimarowski testified that he viewed Ms. Linville's statement as not credible. He first said that the fact that the statement was made ten weeks after the purported confession during a drug debriefing was a "massive red flag" as persons in drug debriefings are generally trying to put themselves in a better position In other words, individuals often seek to gain some benefit during a drug debriefing by offering to assist the police in solving another crime. Mr. Zimarowski stated:

> [I]n my experience of sitting through hundreds of drug debriefings, petitioners, witnesses will exaggerate, embellish make up stuff simply to put themselves in a more favorable position. Their credibility in my opinion at a drug debriefing is very close to 10 percent, 20 percent, maybe.

Mr. Zimarowski further explained that the veracity of Ms. Linville's statement was also questionable given the fact that the details of the purported confession that she

11

related were in no way consistent with the evidence the State was going to present at trial. In that regard, Mr. Zimarowski pointed out the State's evidence showed that the victim was actually shot in the back and not in the chest as allegedly claimed by Robert Coles, according to Ms. Linville. Further, the eyewitnesses at the scene of the crime reported that Mr. Wilkins was chased across the parking lot by the perpetrator and then shot after he fell down. This evidence suggests a premeditated effort to track down the victim and kill him. Yet, according to Ms. Linville, Robert Coles said that he shot the victim because he did not like the way he looked at him, which suggested an impulsive and random shooting.[5]

Also, critically important to Mr. Zimarowski's decision was the fact that the police had interviewed Robert Coles and he denied making the confession to Ms. Linville. In that regard, Mr. Zimarowski testified:

> If I assume that Robbie Coles is going to come in and testify that he never made the statement and that he was never involved in the Wilkins shooting–okay, that's going to come in. Now what could I use that for? Well, there's a 50/50 probability in my mind that should he take the stand, he is going to say through any type of questioning at all that he passed a polygraph, which causes me to lose my jury because it will be a mistrial granted.
>
> Plus Robbie Coles, in my opinion, is not credible [as the shooter] since there is no connection, there's no corroboration with this statement. So a jury is going to view Robbie Coles

---

[5]There was no evidence that Mr. Wilkins and Mr. Coles had ever met. While Mr. Wilkins lived close to the campus of West Virginia University, Mr. Coles resided outside of Morgantown.

12

possibly as not very credible or not credible. Now this viewing him as not credible is going to reflect upon the direct testimony of Mr. Ferguson. I would much rather have in a trial an unknown witness, an unknown culprit out there than having a known culprit. . . . Juries in my experience will grab onto an unknown or they'll grab onto something that is not done rather than something that is done or something that is in front of them. So having Robbie Coles testify that he denied doing the shooting served the defense not one whit.[6]

(Footnote added).

In sum, Mr. Zimarowski explained that he chose not to pursue the alleged confession of Robert Coles and declined to call Ms. Linville, Ms. King and Mr. Coles as witnesses because hanging his hat upon such questionable testimony would have harmed Mr. Ferguson's credibility and because it would have appeared that he was grasping at straws to create an alternative suspect. With regard to Ms. Linville and Ms. King, he further explained:

Well, first off, they're not in my opinion credible. They're subject to shooting fish in a barrel as far as cross-examination is concerned. You have the late disclosure of ten weeks. You have their statements which indicated that it occurred several days after the shooting because there's reference made to a police–a newspaper article and a police report. So they're not credible. It looked like if I put the girls on the stand that I'm basically searching, I'm basically creating a false witness, a false suspect. I would much rather have that

---

[6]Had Robert Coles testified at trial, the jury surely would have also noticed that he did not match the description of the suspect given by the eyewitnesses to the murder. They described the shooter as being 6'1" to 6"2" tall and weighting 180 to 210 pounds. At that time, Robert Coles was 5'9" and weighed 130 pounds.

> suspect not present in the courtroom, not identified. Let the jury extrapolate from that if they desire. That's why I strategically chose to . . . throw Coles out there but not have him subject to cross-examination.

Mr. Zimarowski also indicated that because his trial strategy included putting Mr. Ferguson on the stand to testify and deny that he murdered Mr. Wilkins, he wanted to eliminate any information or evidence which would have been detrimental to the credibility of the defense. In that regard, he stated:

> You want to keep that out and then keep the focus since – in my opinion, Brian [Mr. Ferguson] made an excellent witness. He was well spoken. He's intelligent. Presented well. He looked well.

Mr. Zimarowski concluded that if he had called Robert Coles as a witness and he had testified that he had no involvement in Mr. Wilkins's shooting, then "the jury could have evaluated it, and if they found the evidence against Robert Coles wanting, and they would have in my opinion because it wasn't credible, then they would have said, well if he didn't do it, then Brian Ferguson must have." While credible evidence that might buttress the defense could certainly be said to require independent investigation, there is little value in pursuing fanciful stories that can only serve to weaken the credibility of counsel and, therefore, the defendant, at trial. This is particularly true where, as here, counsel intended to place Mr. Ferguson on the witness stand to tell his own story. Given these circumstances, Mr. Ferguson's counsel could not afford to offer any evidence that could not withstand strict scrutiny by the jury.

14

Moreover, nothing in *Miller/Strickland* requires defense counsel to be an active participant in a wild goose chase, lest he be accused of ineffective assistance. In stark contrast to the cases relied on by the majority, Mr. Zimarowski did not fail to investigate direct, substantive evidence of his client's alleged guilt such as forensic evidence or eyewitnesses. Rather, he refused to waste time and resources attempting to prove the guilt of a third party. Mr. Zimarowski did not blindly accept the investigation and documentation of the police as presumptively true; rather, he recognized that, true or not, further investigation into the Robert Coles confession was not likely to prove it true or false, nor add anything to his client's defense. That is to say, assume that Mr. Zimarowski had interviewed Mary Linville, Spring King, and Robert Coles. Assume further that they adhered strictly to what they told police; what value is this wholly incredible "confession and denial" to his defense? Assume, on the other hand, that the witnesses tried to embellish or alter their statements such as to be more in keeping with the physical evidence *just as they did at the habeas proceeding*.[7] Now, the witnesses are subject to impeachment both on the *internal* inconsistency of their statements as well as inconsistency with the physical evidence of the

---

[7]In her statement to police, Mary Linville stated that Robert Coles drunkenly confessed two days after the murder, referencing newspaper reports regarding the shooting and stating that the police did not know "what they were talking about" because he shot him in the chest, not the back. During the course of the habeas proceeding, Mary Linville gave an elaborate tale of Robert Coles arriving at Spring King's trailer anxiously begging for a "place to hide out" because he had "just shot a f*cking n*gger" down the hill. In addition, Spring King's testimony regarding virtually every detail of this encounter was completely contradictory to Mary Linville's account, except for the forced theme that Coles said he had just shot someone.

15

crime. Ultimately, regardless of what further investigation would have revealed, no amount of rehabilitation would save these witnesses from their inherent incredibility. Their lack of credibility and, more importantly, resultant damage to the party "vouching" for them by calling them as witnesses, would have been devastating to an otherwise well-crafted defense.

In light of all the above, it is clear that Mr. Zimarowski made a reasonable decision that Mr. Ferguson's defense would be served best by allowing Robert Coles to be simply mentioned during the course of trial as another suspect who was investigated by the police rather than calling him, Ms. Linville or Ms. King to testify. While directing the jury's attention to an alternative suspect can be good trial strategy, staking the credibility of the defense upon a non-existent confession and testimony that is easily subject to impeachment is not. Consequently, it was unnecessary for Mr. Zimarowski to waste time or resources further investigating Ms. Linville's statement and Robert Coles's purported confession. In short, not only was this strategy reasonable, it was proven absolutely correct during the habeas proceedings.

## II. *The Second Prong of Strickland*

Finally, proof of the second prong of *Strickland* is markedly absent. There is simply no reasonable probability that but for Mr. Zimarowski's failure to waste time chasing the ever-changing stories of Mary Linville, the outcome of Mr. Ferguson's trial would have been different. Relying solely upon the testimony of Ms. Linville and Ms. King from the habeas hearing, the majority summarily concludes that the result would have been different

16

"had trial counsel presented evidence derived from a proper investigation of the Coles confession." This conclusion necessarily requires the majority to ignore the compelling evidence presented against Mr. Ferguson at trial outlined above. More importantly, it also illustrates that the majority's reasoning is not only inadequate, but a moving target: is the majority critical of the mere failure to *investigate* the Robert Coles confession or the failure to introduce the evidence of the purported confession, in whatever state of investigation, at trial? Is defense counsel, upon any retrial of Mr. Ferguson, now obligated to introduce this irrefutably damaging testimony lest they, too, be found to be ineffective?

Regardless, *Strickland* provides that "ineffectiveness claims alleging deficiency in attorney performance are subject to a general requirement that the defendant *affirmatively prove prejudice*." 466 U.S. at 693 (emphasis added). As the Supreme Court explained:

> Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. *They cannot be classified according to likelihood of causing prejudice*. Nor can they be defined with sufficient precision to inform defense attorneys correctly just what conduct to avoid. Representation is an art, and act or omission that is unprofessional in one case may be sound or even brilliant in another. Even if a defendant shows particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense.

*Id.* (emphasis added). The majority weakly concludes that "a jury *could have* reasonable doubts about the guilt of Mr. Ferguson." This conclusion is far from the affirmative showing of prejudice required by *Strickland* and somewhat startling in its lack of conviction.

17

That the majority would have Mr. Zimarowski engage in the fool's errand of conducting his own investigation into the alleged confession of Robert Coles is inexplicable enough. However, to suggest that calling almost comically incredible witnesses in support of the alleged Robert Coles confession would have more likely than not resulted in an acquittal is outright shocking. As ostensible support for its contention that the jury may have done something other than utterly disregard her testimony, the majority takes on the yeoman's task of trying to bolster the credibility of Mary Linville. In its analysis, the majority has the temerity to suggest that Mary Linville was likely being truthful by inculpating Robert Coles because she was merely trying to help herself and did not know Mr. Ferguson. The idea that a drug-addicted criminal in the throes of a federal drug debriefing, who is attempting to gain leniency by acting as an informant to law enforcement, would certainly never *lie* to those authorities is naive, to put it mildly. Moreover, the majority's position that since Mary Linville did not know Mr. Ferguson, she is more credible, is likewise myopic. While she may not know Mr. Ferguson, it is clear she knew Robert Coles and fingering him in an active murder investigation could easily have been her goal regardless of whether it also helped Mr. Ferguson. It is also reasonable to conclude that Mary Linville's friend, Spring King, would also have motive to inculpate Robert Coles particularly since her only other interaction with him was when he spat in her face.

Far from being ineffective, Mr. Zimarowski did everything possible within the constraints of the law to zealously represent Mr. Ferguson. The record reflects that Mr.

18

Zimarowski persuaded the trial court to exclude what could have been damning evidence against Mr. Ferguson including his prior criminal history involving theft and possession of a firearm, fraudulent use of a credit card and, most significantly, an out-of-court boastful statement that he had chased and shot someone in Washington, D.C. Mr. Zimarowski's decision not to follow up or further investigate the alleged confession of Robert Coles was clearly reasonable and certainly does not represent the ineffective assistance of counsel contemplated under the highly deferential standard for acceptable assistance of counsel under *Strickland*. Therefore, for the reasons set forth above, I would reverse the circuit court's order granting the writ of habeas corpus. Accordingly, I respectfully dissent from the majority's decision in this case. I am authorized to state that Justice Workman joins in this dissent.