# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**Ray D. Cook,**
**Plaintiff Below, Petitioner**

**vs.)  No. 20-0802** (Jefferson County CC-19-2014-C-229)

**Karen Pszczolkowski, Superintendent,**
**Northern Correctional Center,**
**Defendant Below, Respondent**

# MEMORANDUM DECISION

Petitioner Ray D. Cook, by counsel Christian J. Riddell, appeals the Circuit Court of Jefferson County's September 11, 2020, order denying his petition for a writ of habeas corpus. Respondent Karen Pszczolkwski, Superintendent, Northern Correctional Center, by counsel Patrick Morrisey and Scott E. Johnson, filed a response in support of the circuit court's order.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision is appropriate under Rule 21 of the Rules of Appellate Procedure.

On July 15, 2011, petitioner planned to meet with his ex-girlfriend, Jenny Perrine, to give her the dogs they jointly owned. On that same date, Ms. Perrine's co-worker saw petitioner walk through the employee parking lot of the pharmacy where she and Ms. Perrine worked and "use his finger as a gun and point it at [Ms. Perrine's] car." Also on that date, another co-worker heard a conversation between petitioner and Ms. Perrine wherein he was "telling [Ms. Perrine] off" and "cussing her out." That co-worker further overheard petitioner screaming obscenities at Ms. Perrine, causing her to become distraught and tearful. Petitioner's ex-wife, Tara Myers, received text messages from petitioner at 2:06 p.m. on that date asking her to tell their children, "I love them every day of their lives!!!" During a text exchange with Ms. Myers, petitioner stated, "To tell u the truth I'm getting ready to kill jen! So ill be going away for awhile[.]"

Petitioner and Ms. Perrine met in the parking lot of Southern States in Ranson, West Virginia. However, petitioner did not bring the dogs, as agreed upon. Instead, petitioner fired a gun into Ms. Perrine's car multiple times while she sat inside. Numerous witnesses at Southern States testified that they watched petitioner shoot Ms. Perrine on July 15, 2011. Petitioner called

1

9-1-1 to report that he had shot Ms. Perrine and that he had not taken his medication that day. He was indicted on one count of first-degree murder and one count of brandishing a firearm.

During the bifurcated trial, Ms. Perrine's co-workers and numerous witnesses from Southern States testified regarding the events of July 15, 2011. In addition, the jury heard the recording of the 9-1-1 call, wherein petitioner admitted killing Ms. Perrine. Further, the defense stipulated that petitioner was the shooter. Petitioner's defense focused on his assertion that he suffered diminished capacity, rather than whether petitioner killed Ms. Perrine. At the close of the State's case-in-chief, petitioner moved for a directed verdict, but the circuit court denied that motion.

Petitioner's presentation of evidence included testimony from psychologist Dr. Bernard Lewis, who testified that petitioner "was in an altered state of mind such that he was unable to control his thoughts, his feelings and his behaviors, and that is what directly resulted in his actions at that time[.]" He further testified that petitioner suffered from bipolar disorder at the time petitioner shot Ms. Perrine and was still bipolar at the time of the trial. While Dr. Lewis denied finding any support for a diagnosis of post-traumatic stress disorder ("PTSD"), he acknowledged that petitioner "served in Bosnia" and set forth some of the things petitioner experienced during that service. In addition to addressing a report from Dr. Clayman, an expert for the State, and medical records from the Veteran's Administration ("VA"), Dr. Lewis testified that petitioner's diminished capacity made him unable to premeditate, deliberate, or form malice when he shot Ms. Perrine on July 15, 2011. Petitioner also presented testimony from his mother, an expert in the field of "pharmacology adverse drug reactions," an expert in "forensic psychiatry," and a "close friend." At the conclusion of the presentation of his evidence, petitioner renewed his motion for a directed verdict of acquittal, which was again denied by the circuit court.

In rebuttal, the State called a psychopharmacology expert and Dr. Clayman, a psychologist, who opined that petitioner's texts to his ex-wife showed that petitioner's intent was purposeful and a "reality-based statement." Dr. Clayman concluded that petitioner did not suffer from any kind of psychosis, delusion, hallucination, or break with reality that would have caused him to have diminished capacity. Following closing statements and the circuit court issuing instructions to the jury, the jury found petitioner guilty of first-degree murder and brandishing. The mercy phase of the trial then began, at the conclusion of which the jury did not recommend mercy. Petitioner was, accordingly, sentenced to life, without the possibility of parole, on first-degree murder and one year in jail for brandishing. Petitioner's convictions were affirmed by this Court in *State v. Cook*, No. 12-0836, 2014 WL 620478 (W. Va. Feb. 12, 2014) (memorandum decision).

Petitioner then filed a petition for a writ of habeas corpus before the circuit court. The circuit court held an omnibus hearing on January 21 and January 23, 2020, during which petitioner testified. According to the circuit court's lengthy September 11, 2020, order denying petitioner's habeas petition, petitioner's testimony "was contradicted by competent evidence in numerous different ways[. T]he [c]ourt finds [petitioner's] testimony to be incredible and contradicted by other evidence." In that order, the circuit court engaged in a lengthy review of petitioner's testimony and the evidence presented throughout the trial, in addition to trial counsels' assistance.

The court ultimately concluded, in relevant part, that petitioner's trial counsel was not ineffective;[1] any due process argument related to alleged jury tampering that was inferentially raised in the petition is denied; a new PTSD diagnosis is not newly discovered evidence and is not cause to grant petitioner's habeas petition; and petitioner failed to meet his burden to show that he was not competent so mental capacity at the time of trial is not a ground to grant the habeas petition. Petitioner appeals from that September 11, 2020, order denying his petition for a writ of habeas corpus.

> In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Mathena v. Haines*, 219 W. Va. 417, 633 S.E.2d 771 (2006).

On appeal, petitioner argues that the circuit court erred by denying his motion for a new trial as to the guilt phase and by denying his motion for a new trial as to the mercy phase. With regard to his assertion that he was entitled to a new trial on the guilt phase, petitioner argues that he should have been granted a new trial due to ineffective assistance of counsel and newly discovered evidence after petitioner was diagnosed with PTSD at the time of the crime, though the diagnosis was subsequent to the verdict.

He asserts that trial counsel was ineffective because counsel failed to fully and adequately investigate the change in petitioner's demeanor and failed to submit what counsel uncovered regarding petitioner's "shooting of animals and sudden loss of aim to the jury." Trial counsel and the circuit court suggested that this was a valid strategic choice because mentioning "these things would have somehow made [p]etitioner look worse to the jury, but he was already on trial for murdering his girlfriend, and his role as the shooter was not in question." He, therefore, contends that "bringing up that he had suddenly tak[en] to shooting animals and had suddenly lost his aim although he was a trained marksmen [sic] could only help under these circumstances." Petitioner further argues that there was little or no strategic value to refusing to move for a mistrial after the

---

[1] Included in this finding were specific findings that trial counsel communicated regularly with petitioner, fully investigated the case, and presented a competent guilt phase case; trial counsel obtained the VA medical records, which were utilized by petitioner's experts during his criminal trial; defense counsel was not ineffective for not finding medication in Ms. Perrine's purse prior to trial; trial counsel utilized sound trial strategy in avoiding a focus on petitioner's marksmanship during his criminal trial; trial counsel was not ineffective for not utilizing petitioner's shooting of small animals at trial; petitioner's allegation that trial counsel did not communicate the State's plea offer is without merit; trial counsel made a strategic decision not to move for a change in venue and that decision was not ineffective; trial counsels' decision not to move for a mistrial based on a juror question to a State witness is not ineffective assistance; and trial counsel was not ineffective for not putting on evidence in the mercy phase of the trial.

jury tampering issue and after Ativan was discovered in Ms. Perrine's purse.[2] He claims that he "called a suicide hotline shortly before the shooting . . . and Mr. Mills did not obtain this footage, which would have likely proved invaluable at trial." According to petitioner, without citation to the record, Mr. Mills admitted visiting petitioner only three times prior to trial, which demonstrates insufficient communication.

Petitioner also argues that the circuit court erroneously found that his new PTSD diagnosis was not newly discovered evidence and justified its finding by analogizing the diagnosis with a new expert interpreting old evidence, which, he contends has been found by a variety of Minnesota and Wisconsin courts to be insufficient. However, petitioner fails to cite any law in support of this contention, and none of the cases listed in the table of authorities are from either of these states. He asserts that his diminished capacity defense was based largely on the fact that he had been taking a variety of medications, including some non-prescribed medications, which mixed together to cause his diminished capacity and led to the shooting. He contends that "[t]his theory of the case would have been significantly aided had his experts been able to point to a pre-existing PTSD condition." According to petitioner, he expects to be able to produce expert witness testimony that would link petitioner's PTSD diagnosis with the temporary state of psychosis petitioner claimed to be in at the time he shot Ms. Perrine. He also expects that expert testimony will demonstrate that such defense would have been much stronger, including that the signs and symptoms petitioner exhibited in the weeks leading up to Ms. Perrine's death were consistent with PTSD.

At the outset, we note that petitioner failed to cite to the record a single time in the argument section of his brief, in clear violation of West Virginia Rule of Appellate Procedure 10(c)(7).[3] Further, while petitioner references a jury tampering issue, he fails to provide sufficient detail for

---

[2] Ativan is a medication that is typically used to treat anxiety. Petitioner fails to inform this Court of the alleged importance of the medication being found in Ms. Perrine's purse.

[3] Rule 10(c)(7) provides that

[t]he brief must contain an argument exhibiting clearly the points of fact and law presented, the standard of review applicable, and citing the authorities relied on, under headings that correspond with the assignments of error. The argument must contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal. The Court may disregard errors that are not adequately supported by specific references to the record on appeal.

W. Va. R. App. P. 10(c)(7). Additionally, in an Administrative Order entered December 10, 2012, Re: Filings That Do Not Comply With the Rules of Appellate Procedure, the Court noted that "[b]riefs that lack citation of authority [or] fail to structure an argument applying applicable law" are not in compliance with this Court's rules. Further, "[b]riefs with arguments that do not contain a citation to legal authority to support the argument presented and do not 'contain appropriate and specific citations to the . . . record on appeal . . .' as required by rule 10(c)(7)" are not in compliance with this Court's rules.

this Court to understand the issue. Similarly, petitioner fails to set forth the significance of the Ativan discovery. As we have found,

> the cases in which a defendant may prevail on the ground of ineffective assistance of counsel are few and far between one another. This result is no accident, but instead flows from deliberate policy decisions this Court and the United States Supreme Court have made mandating that "[j]udicial scrutiny of counsel's performance must be highly deferential" and prohibiting "[i]ntensive scrutiny of counsel and rigid requirements for acceptable assistance[.]" *Strickland [v. Washington]*, 466 U.S. [668,] 689-90, 104 S.Ct. [2052,] 2065-66, 80 L.Ed.2d [674,] 694–95 [(1984)]. In other words, we always should presume strongly that counsel's performance was reasonable and adequate. A defendant seeking to rebut this strong presumption of effectiveness bears a difficult burden because constitutionally acceptable performance is not defined narrowly and encompasses a "wide range." The test of ineffectiveness has little or nothing to do with what the *best* lawyers would have done. Nor is the test even what most good lawyers would have done. We only ask whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at the time, in fact, worked adequately.

*State v. Miller*, 194 W. Va. 3, 16, 459 S.E.2d 114, 127 (1995).

> "In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-prong test established in *Strickland . . .* : (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syllabus point 5, *State v. Miller . . . .*

Syl. Pt. 3, in part, *State ex rel. Vernatter v. Warden, W. Virginia Penitentiary*, 207 W. Va. 11, 528 S.E.2d 207 (1999).

> In reviewing [*Strickland's* first prong,] counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

*Miller*, 194 W. Va. at 6-7, 459 S.E.2d at 117-18, Syl. Pt. 6. In reviewing the second prong, prejudice, the court looks at whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Vernatter*, 207 W. Va. at 13, 528 S.E.2d at 209, Syl. Pt. 3, in part (quoting *Miller*, 194 W. Va. at 6, 459 S.E.2d at 117, Syl. Pt. 5, in part).

The circuit court specifically found that both Mr. Mills and Mr. McDermott, petitioner's trial counsel, testified at the habeas hearing that neither petitioner nor his family raised the issue of shooting small animals or similar conduct with them so counsel were unaware of the alleged issue. With regard to petitioner being a trained marksman, the habeas court noted that Mr. Mills discussed the issue with petitioner, but Mr. Mills explained that counsel "did not believe that that would be helpful to present to the jury . . . and we didn't think it would be helpful to emphasize that to the jury, because, as I recall, there were 15 or 16 shots. And as I recall . . . nine or ten of those hit the decedent." The circuit court found that it could "clearly see the strategic benefit in not emphasizing to the jury [petitioner's] firing of sixteen (16) shots at the victim, as stated in the autopsy, ten (10) shots hit the decedent." While petitioner also claims that his counsel did not obtain "footage" of a telephone call he allegedly made to a suicide hotline shortly before he murdered Ms. Perrine, he did not produce a copy of such footage at his habeas proceeding or point to proof that such footage even exists. Further, Mr. Mills testified that he did not recall petitioner ever telling him about such call. And, finally, although petitioner complains that Mr. Mills visited with him only three times, he ignores the fact that Mr. Mills's co-counsel, Mr. McDermott, also visited with petitioner in order to formulate the defense and the trial strategy. Moreover, petitioner does not allege, in the two-paragraph portion of his argument dedicated to ineffective assistance of counsel in the guilt phase, that but for counsel's alleged errors the jury would have reached a different result. Based on petitioner's arguments, some of which are not sufficiently clear and none of which are supported by references to the record, we cannot find that petitioner received ineffective assistance of trial counsel during the guilt phase.

We now turn to petitioner's contention that the circuit court erred by denying his motion for a new trial based upon the PTSD diagnosis he received subsequent to the trial. As we have long held,

> "'[a] new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his affidavit that plaintiff was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side.' Syllabus Point 1, *Halstead v. Horton*, 38 W.Va. 727, 18 S.E. 953 (1894)." Syl. *State v. Frazier*, 162 W.Va. 935, 253 S.E.2d 534 (1979).

Syl. Pt. 2, *State ex rel. Smith v. Sims*, 240 W. Va. 601, 814 S.E.2d 264 (2018).

During the guilt phase of the trial, petitioner presented several experts who provided testimony regarding his mental health, including "pharmacology adverse drug reactions." As respondent set forth before the circuit court,

> [t]he jury . . . heard about [petitioner's] military service and his exposure to dead bodies whether by sight or smell as well as being near gunfire without the ability to return fire while serving with the United State[s] Marines in Bosnia. Trial counsel testified that the jury heard about these issues as well as all of the other attendant circumstances that gave rise to the argument for diminished capacity from trial counsel. [] Over the course of the nine (9) day trial, experts opining on behalf of [petitioner] testified for approximately three (3) days . . . Cumulatively, the jury heard approximately four (4) and a half days of medical evidence related to [petitioner's] mental illness, prescription drug usage and whether they would, acting in concert, result in diminished capacity. [] The jury determined that [petitioner] did not suffer diminished capacity when it convicted him of [m]urder of the [f]irst [d]egree after deliberating for approximately three (3) to four (4) hours.

According to the trial testimony of one of petitioner's mental health experts, Dr. Brewer, who spent approximately six hours interviewing petitioner, and additional time interviewing some of petitioner's family members and reviewing reports from other experts, "at the time of the shooting . . . [petitioner] was in an altered state of mind such that he was unable to control his thoughts, his feelings and his behaviors, and that is directly what resulted in his actions at that time." He further testified that petitioner suffered from and continued to suffer from bipolar disorder, detailing for the jury how the condition impacts individuals such as petitioner. Dr. Brewer further addressed PTSD, testifying as follows:

> I know he served in the service, and I know he served in Bosnia, and I know he served in a combat area. I know he was in an area where he heard weapons were fired, he heard bullets, he had all of that, but I think that it is real interesting that he never made in his talk with me any kind of claim that any of this happened because of PTSD. He never brought that up or tried to blame this on that. So, no, in my interviews with him I didn't find enough to suggest that there was a PTSD related to his time in the service.

Petitioner specifically argued below, and generally argues before this Court, that "it is substantially likely that if the jury would have received knowledge of [p]etitioner's PTSD affliction, it may have changed the ruling of the jury with regard to either guilt, and, or sentencing . . . [so] it is reasonable to believe that [p]etitioner may have had a different outcome at trial." Without citing to the record or any authority, he argues that if the PTSD diagnosis had been made prior to trial and presented to the jury, it may have led to a full insanity defense. Thus, it appears that petitioner is attempting to discredit his own expert trial witnesses, particularly Dr. Brewer. Because a variety of mental health related opinions were presented at trial by both petitioner and the State, under the specific facts of this case, we find that yet another expert opinion would be cumulative evidence, which does not entitle petitioner to a new trial.

Petitioner's second assignment of error is his contention that the circuit court erred in

7

denying petitioner's motion for a new mercy phase of the trial because he received ineffective assistance of counsel. Petitioner again asserts that he received ineffective assistance of counsel because counsel failed to conduct an adequate investigation. He argues that, based on the trial testimony, it is undisputed that the vast majority of character witnesses made known to trial counsel by petitioner were not contacted by counsel, despite what petitioner characterizes as their clear availability, as evidenced by trial counsels' ability to procure "[m]ercy letters thereafter. There is simply no good reason provided why [p]etitioner's trial counsels did not procure these letters prior to the [m]ercy trial or, at the very least, obtain a list of these many potential character witnesses in time to use the same during said [m]ercy trial. . . ." According to petitioner, without citation to the record, both attorneys blame their failure to investigate and call character witnesses on petitioner's "hard-heartedness" and lack of remorse. Petitioner claims that those excuses are belied by petitioner's letters written during the pendency of the case where he clearly expressed remorse for what he had done.

We again look to the *Strickland*/*Miller* test in determining whether petitioner received ineffective assistance of counsel. Mr. Mills testified that he and Mr. McDermott were prepared to call petitioner and petitioner's mother during the mercy phase, but petitioner told Mr. Mills that he was "hard-hearted towards [Ms. Perrine's] family." Mr. Mills expressed concern that petitioner would not come across as remorseful and that his testimony could have a negative effect on the jury. The habeas court noted Mr. McDermott's assessment that such anger, if displayed to the jury, could prove "devastating." Mr. Mills explained that calling witnesses during the mercy phase would highlight to jurors that petitioner did not testify or express remorse to the jury. Mr. Mills further testified that he did not believe the instruction relating to petitioner's right not to testify would be sufficient to protect petitioner from the jury's feelings. During the mercy phase, Mr. Mills tried to persuade the court that because petitioner was not calling witnesses, the State should be precluded from calling witnesses. The circuit court found that although trial counsels' mercy strategy failed, it did not make counsel ineffective. During the habeas proceeding, both trial counsel testified that petitioner could not show remorse if called to testify, and they presented valid reasons for choosing not to call other witnesses during the mercy phase. Due to the overwhelming strength of the evidence presented against petitioner during the guilt phase, it is not reasonably probable that the result would have been different if counsel had called witnesses during the mercy phase. Further, it is clear that the decision not to call such witnesses was a strategic decision based, in part, on information directly from petitioner. For these reasons, we find that the circuit court did not abuse its discretion by denying petitioner habeas relief on this ground.

Affirmed.

**ISSUED:** March 31, 2022

**CONCURRED IN BY:**

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Alan D. Moats sitting by temporary assignment

8

**DISSENTING:**

Wooton, J., dissenting:

I respectfully dissent to the majority's affirmance of the order denying this petition for writ of habeas corpus. I would have placed this matter on the Rule 20 argument docket to fully examine whether a post-trial, supplemental expert opinion—in this case medical evidence relating to Petitioner's mental capacity—constitutes "newly discovered evidence" which warrants granting a petition for writ of habeas corpus. That question is a matter of first impression for this Court and, as such, warrants review on the Rule 20 argument docket.

Accordingly, I respectfully dissent.